IN THE CASE OF


UNITED STATES, Appellee

v.

Delmar G. SIMPSON, Staff Sergeant
U.S. Army, Appellant

No. 02-0001

Crim. App. No. 9700775

United States Court of Appeals for the Armed Forces

Argued December 11, 2002

Decided July 1, 2003

EFFRON, J., delivered the opinion of the Court, in which
CRAWFORD, C.J., GIERKE, BAKER and ERDMANN, JJ., joined.


Counsel

For Appellant:  Frank J. Spinner, Esq. (argued); Colonel Adele
    H. Odegard, Major Imogene M. Jamison, and Captain Eilin J.
    Chiang (on brief); Captain Stephanie L. Haines.


For Appellee:  Captain Abraham F. Carpio (argued); Lieutenant
    Colonel Margaret B. Baines, Lieutenant Colonel Lauren B.
    Leeker, Major Mark L. Johnson, and Captain Tami L. Dillahunt
    (on brief); Major Paul T. Cygnarowicz.



Military Judges:  Joseph Neurauter, Linda K. Webster, and Paul Johnston


THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE FINAL PUBLICATION.

Judge EFFRON delivered the opinion of the Court.

A general court-martial composed of officer and enlisted members convicted Appellant, pursuant to his pleas, of failure to obey a lawful general order (10 specifications) in violation of Article 92, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. § 892 (2000). Contrary to his pleas, Appellant was convicted of failure to obey a lawful general order (3 specifications), cruelty and maltreatment of a subordinate (2 specifications), rape (18 specifications), forcible sodomy (1 specification), consensual sodomy (2 specifications), assault consummated by a battery (1 specification), indecent assault (12 specifications), indecent acts (1 specification) and communicating a threat (2 specifications), in violation of Articles 92, 93, 120, 125, 128, and 134, UCMJ, 10 U.S.C. §§ 892, 893, 920, 925, 928, 934 (2000), respectively. He was sentenced to a dishonorable discharge, confinement for 25 years, total forfeitures, and reduction to Private (E-1). The convening authority approved the adjudged sentence and credited Appellant with 413 days against his sentence to confinement.

The Army Court of Criminal Appeals, in an opinion containing an extensive description of the factual and legal background, set aside and dismissed three of the 12 indecent assault specifications and one of the 18 rape specifications, affirmed a

lesser included finding of failure to obey a lawful general order (1 specification), modified one of the indecent assault specifications and one of the rape specifications, affirmed the balance of the findings, reduced the confinement to 22 years, and approved the balance of the sentence.  United States v. Simpson, 55 M.J. 674 (Army Ct. Crim. App. 2001).

On Appellant's petition, we granted review of the following issues:

> I. WHETHER THE MILITARY JUDGE GAVE AN ERRONEOUS INSTRUCTION REGARDING "CONSTRUCTIVE FORCE - ABUSE OF MILITARY POWER" WITH RESPECT TO THE RAPE AND FORCIBLE SODOMY SPECIFICATIONS WHICH SUBSTANTIALLY PREJUDICED APPELLANT'S CASE.
>
> II. WHETHER APPELLANT'S DUE PROCESS RIGHTS UNDER THE FIFTH AMENDMENT OF THE UNITED STATES CONSTITUTION WERE VIOLATED DUE TO UNLAWFUL COMMAND INFLUENCE AND UNFAIR PRETRIAL PUBLICITY.

We shall first discuss the granted issue involving unfair pretrial publicity and unlawful command influence, and then turn to the granted issue regarding instructions on constructive force.  For the reasons set forth below, we affirm the decision of the Court of Criminal Appeals.

I. UNFAIR PRETRIAL PUBLICITY AND UNLAWFUL COMMAND INFLUENCE

A. BACKGROUND

The Criminal Investigation Command (CID) opened an investigation into trainee abuse allegations against Appellant and others in September 1996. The allegations with respect to Appellant concerned the period between November 1994 and September 1996 when Appellant was assigned to the Ordnance Center and School (School), Aberdeen Proving Grounds, Maryland. Although the School is located at Aberdeen, it is under the immediate command of the Training and Doctrine Command (TRADOC), Fort Monroe, Virginia.

During the initial phase of the investigation, Appellant remained assigned to the School, which was commanded by Major General (MG) Shadley. MG Shadley, who was not a convening authority, exercised general command and control functions over the School. In response to the scope of the allegations by trainees against Appellant and others, MG Shadley organized a "Command Response Team" to monitor the investigation, determine whether there were systemic problems, and take preventive action. The team was composed of personnel from the School, the installation staff, and other tenant units on the installation. Colonel (COL) Webb, who exercised special court-martial jurisdiction over Appellant during the initial phase of the

4

investigation, was a member of the team.  Summarized reports of the team's activities were provided to MG Longhouser, who simultaneously served as the garrison commander of Aberdeen Proving Ground and commander of the Test and Evaluation Command (TECOM), and COL Glantz, the Garrison Commander.

When concern arose that statements made by MG Shadley during this period might be viewed as improperly influencing his subordinates, including COL Webb, Appellant and others under investigation were transferred from the School to the Garrison Command at Aberdeen Proving Ground on October 4, 1996.  Under the transfer, the responsibility for disposition and action on military justice matters regarding Appellant was removed from COL Webb and became the responsibility of officers assigned to the Garrison Command.  The transfer did not affect MG Shadley's responsibility for activities at the School, including management, training, and follow-up activities related to the investigation.

The new general court-martial convening authority over Appellant was the Garrison Commander, MG Longhouser.  His immediate superior was General Wilson, Commander of the Army Material Command, located in Alexandria, Virginia.  COL Glantz became the new special court-martial convening authority.

During the fall of 1996, the CID continued its investigation of alleged trainee abuse by Appellant and others,

and eventually expanded the investigation to cover all Army training installations. In light of the expanding nature of the investigation, MG Longhouser concluded that media inquiries would soon follow. Following recommendations from MG Longhouser and MG Shadley, the Army held press conferences on November 7, featuring remarks from the Chief of Staff of the Army, the Commander of TRADOC, and MG Shadley regarding the investigation in particular and trainee abuse in general.

Later in November, COL Glantz recommended to MG Longhouser that the charges against Appellant be referred to a general court-martial. On November 21, MG Longhouser referred the charges for trial by general court-martial. In designating the primary and alternate court-martial members under Article 25, UCMJ, 10 U.S.C. § 825 (2000), MG Longhouser excluded all personnel under MG Shadley's command at the School. Subsequently, three sets of additional charges were reviewed by COL Glantz and referred by MG Longhouser for trial by the same court-martial. At the initial session of the court-martial on December 6, the military judge presiding over pretrial motions announced that he would order the primary and alternate court-martial panel members to avoid exposure to print and electronic media stories concerning the investigation of sexual misconduct at Aberdeen.

Between November 1996 and March 1997, statements about the investigation and remarks about policy issues related to trainee abuse were made by the Secretary of Defense, the Secretary of the Army, the Assistant Secretary of the Army for Manpower and Reserve Affairs, the Chairman of the Joint Chiefs of Staff, the Chief of Staff of the Army, and other senior civilian and military officials. During the same period, the Secretary of the Army established a Senior Review Panel to review actions related to the prevention of sexual harassment. The Chief of Staff of the Army sent a personal letter to all general officers communicating the Army's existing policy on sexual harassment. In addition, the Chief of Staff mandated that all active duty personnel receive instruction on the Army's sexual harassment policy.

On March 3, 1997, the defense filed a motion to dismiss the charges with prejudice based on unfair pretrial publicity and unlawful command influence. After considering briefs, oral testimony, and documentary evidence, the military judge denied the motion on April 7.

## B. DISCUSSION

Appellant contends that his trial was tainted by unfair pretrial publicity as well as unlawful command influence. Much of the record relied upon by Appellant is related to both

concepts.  Although these concepts reflect a common interest in ensuring impartial treatment in the judicial process, they involve differing trial procedures and standards of review.  We shall first address unfair pretrial publicity, and then consider unlawful command influence.

### 1.  Pretrial Publicity

Members of the armed forces are entitled to have their cases adjudged by fair and impartial court-martial panels whose evaluation is based solely upon the evidence, and not upon prejudgment that may occur as a result of pretrial publicity. United States v. Curtis, 44 M.J. 106, 139 (C.A.A.F. 1996), upon reconsideration, 46 M.J. 129 (C.A.A.F. 1997)(findings affirmed and sentence reversed); see Chandler v. Florida, 449 U.S. 560, 574 (1981); Wainwright v. Witt, 469 U.S. 412, 423 (1985); Reynolds v. United States, 98 U.S. 145, 154-57 (1878).  The doctrine of unfair pretrial publicity is based upon the constitutional right to due process.  See U.S. Const. amend. V.

The defense may raise the issue of unfair pretrial publicity by demonstrating either presumed prejudice or actual prejudice.  To establish presumed prejudice, the defense must show that the pretrial publicity (1) is prejudicial, (2) is inflammatory, and (3) has saturated the community.  See Curtis, 44 M.J. at 139 (citing Nebraska Press Ass'n v. Stuart, 427 U.S.

539, 554 (1976)).  Depending on the circumstances of the case, the potential for prejudice may be ameliorated through measures such as a continuance, change of venue, sequestration, and regulation of public comment by counsel.  See Nebraska Press Ass'n, 427 U.S. at 552-53 (citing Sheppard v. Maxwell, 384 U.S. 333 (1966)).  To establish actual prejudice, the defense must show that members of the court-martial panel had such fixed opinions that they could not judge impartially the guilt of the accused.  See Curtis, 44 M.J. at 139 (citing Mu'Min v. Virginia, 500 U.S. 415, 430 (1991); Irvin v. Dowd, 366 U.S. 717, 721-28 (1961)).  Without such a showing, evidence that the members had knowledge of highly significant information or other incriminating matters is insufficient.  Id.

At trial, Appellant's motion to dismiss was accompanied by an extensive collection of news clippings, transcripts of television programs, videotapes, and transcripts of interviews. The material occupies five volumes of the trial record.  The court below variously characterized material as reflecting a "nationwide media blitz" and a "media feeding frenzy."  55 M.J. at 679, 682.  The court used these phrases to describe the quantity and frequency of media interest, not as an evaluation of the content of the material from a due process perspective.

The court observed that the vast majority of the items submitted by Appellant consisted of matter published in the two-

week period following the Army's initial announcement of the investigation on November 7, 1996, and that many of the items duplicated stories "published in various papers across the country with little or no change in content from paper to paper." Id. at 679 n.5. While the court described the media interest about trainee abuse in the Army as "extensive – even pervasive – for approximately one month," the court concluded that the material was not inflammatory, noting that "the pretrial publicity in this case was, in comparison to that found in many civilian criminal investigations, very sparse on details." Id. at 679, 687. We agree.

With respect to presumed prejudice, we note that although there was extensive media interest, Appellant has not demonstrated that the community was saturated with inflammatory prejudicial material. Relatively few of the articles directly referred to Appellant. Moreover, as a precautionary measure, the members were ordered to avoid media coverage of trainee abuse issues. In view of these circumstances, Appellant has not demonstrated presumed prejudice under generally applicable principles of criminal law concerning unfair pretrial publicity. See Rock v. Zimmerman, 959 F.2d 1237, 1252-53 (3d Cir. 1992).

With respect to actual prejudice, we note that the military judge permitted counsel to conduct extensive individual voir dire of the court-martial panel prior to trial on the merits.

10

The examination of the members revealed that the members had encountered very little information about the trial or related matters.  Appellant did not seek a change in venue on the basis of unfair pretrial publicity, nor did Appellant cite unfair pretrial publicity as the basis for challenging any of the members of the court-martial panel.  In view of the foregoing circumstances, Appellant has failed to demonstrate that he was the victim of actual unfair pretrial publicity.  Whether such material constituted unlawful command influence is a different matter, which we shall consider in the following section.

### 2.  Unlawful Command Influence

a. In general

In addition to raising the issue of unfair pretrial publicity, Appellant contends that his court-martial was tainted by actual unlawful command influence and the appearance of unlawful command influence.  Appellant asserts that command influence impermissibly constrained the discretion of the officers involved in the disposition of the charges, and that command influence improperly infected the impartiality of the court-martial panel that adjudged the findings and sentence in the present case.  See Art. 37, UCMJ, 10 U.S.C. § 837 (2000); Rules for Courts-Martial 104, 401(a)(c)(2)(A) discussion.

United States v. Simpson, No. 02-0001/AR

Our cases provide a specific procedure for use at trial to address allegations of actual unlawful command influence. First, the defense must "show facts which, if true, constitute unlawful command influence." United States v. Biagase, 50 M.J. 143, 150 (C.A.A.F. 1999). Second, the defense must show "that the alleged unlawful command influence has a logical connection to the court-martial, in terms of its potential to cause unfairness in the proceedings." Id. "The threshold for raising the issue at trial is low, but more thanmere allegation or speculation." Id. The defense is required to present "'some evidence'" of unlawful command influence. Id. (quoting United States v. Ayala, 43 M.J. 296, 300 (C.A.A.F. 1995)). Third, if the defense has made the requisite showing under the first two steps, the burden shifts to the Government to: (1) disprove "the predicate facts on which the allegation of unlawful command influence is based"; (2) persuade the military judge "that the facts do not constitute unlawful command influence"; or (3) prove at trial "that the unlawful command influence will not affect the proceedings." Id. at 151. "Whichever tactic the Government chooses, the quantum of proof is beyond a reasonable doubt." United States v. Stoneman, 57 M.J. 35, 41 (C.A.A.F. 2002)(citing Biagase, 50 M.J. at 151).

Depending on the nature of the alleged unlawful command influence and other pertinent circumstances, the Government may

12

demonstrate that unlawful command influence will not affect the proceedings in a particular case as a result of ameliorative actions. Such actions might include transfer of responsibility for disposition of charges to commanders not subject to the influence, orders protecting servicemembers from retaliation, changes in venue, liberal grants of challenges for cause, and the use of discovery and pretrial hearings to delineate the scope and impact of alleged unlawful command influence. See, e.g., Biagase, 50 M.J. at 152; United States v. Rivers, 49 M.J. 434, 443 (C.A.A.F. 1998).

During appellate consideration, the three factors are framed in terms of evaluation of a completed trial. "[T]he defense must (1) show facts which, if true, constitute unlawful command influence; (2) show that the proceedings were unfair; and (3) show that the unlawful command influence was the cause of the unfairness." Biagase, 50 M.J. at 150 (citing United States v. Stombaugh, 40 M.J. 208, 213 (C.M.A. 1994)).

In the course of addressing these issues, military judges and appellate courts must consider apparent as well as actual unlawful command influence. As we observed in Stoneman:

> This court has long recognized that, once unlawful command influence is raised, . . . it [is] incumbent on the military judge to act in the spirit of the Code by avoiding even the appearance of evil in [the] courtroom and by establishing the confidence of the general public in the fairness of the

> court-martial proceedings. . . .
> Accordingly, disposition of an issue of
> unlawful command influence falls short if it
> fails to take into consideration the concern
> of Congress and this Court in eliminating
> even the appearance of unlawful command
> influence at courts-martial. . . . The
> appearance of unlawful command influence is
> as devastating to the military justice
> system as the actual manipulation of any
> given trial. . . .
>
> . . . Even if there [is] no actual unlawful
> command influence, there may be a question
> whether the influence of command placed an
> intolerable strain on public perception of
> the military justice system.

57 M.J. at 42-43 (citations, internal quotations and parentheses omitted).

b. The relationship between publicity and unlawful command influence

Appellant's primary contention in the present case is that "[t]here is presumed prejudice and apparent unlawful command influence, because the publicity in [his] case overwhelmingly saturated the military community, as evidenced by the newspaper stories, national news magazine stories, transcripts of television interviews, editorial comments, and interviews of senior officials, which were made part of the record of trial at Appellate Exhibit LXXV."

The gist of Appellant's argument is that unlawful command influence may be established if substantial public interest in a pending proceeding is generated when the military leadership

14

provides information to the media in general, and members of the armed forces in particular, regarding pending charges, which then results in extensive media coverage, commentary, and congressional interest.  As we noted in United States v. Rockwood, 52 M.J. 98, 103 (C.A.A.F. 1999), "Public criticism of military operations – including withering critiques of strategy, tactics, personnel policies, and human rights concerns – is inherent in a democracy."  The prohibition against unlawful command influence does not require senior military and civilian officials to refrain from addressing such concerns  -- including matters affecting the training of recruits -- through press releases, responses to press inquiries, and similar communications.

When members of the public entrust their sons and daughters to the military training process, they expect to receive accurate and complete information about the quality of the training environment, including the state of discipline.  The public also expects military leaders, who exercise both prosecutorial and judicial functions in the military justice process, to exercise due care in developing and executing communications plans when potential military justice actions are pending.  As noted by the court below:

> When those with the mantle of command
> authority deliberately orchestrate pretrial
> publicity with the intent to influence the

15

> results in a particular case or series of
> cases, the pretrial publicity itself may
> constitute unlawful command influence. Even
> the perception that pretrial publicity has
> been engineered to achieve a prohibited end
> – regardless of the intent of those
> generating the media attention – may lead to
> the appearance of unlawful command
> influence.

55 M.J. at 687.

In the present case, the vast majority of the comments made by the senior military and civilian officials were not particularly remarkable. While we must separately consider whether any of the specific statements made by the senior officials constituted unlawful command influence, see Part I.B.2.c., infra, the overall tenor of statements made by senior officials did not constitute an express or implied command position on disposition or adjudication.

Under these circumstances, Appellant has not met his burden under Biagase of demonstrating that the general tenor of the leadership's interaction with the media demonstrated either the intent to improperly influence the court-martial process or the appearance of such an influence. To the extent that Appellant relies upon specific comments in the media by persons outside the chain of command, including Members of Congress, Appellant has not shown that the personnel involved in the disposition of charges or on the court-martial panel were aware of such

comments or that such comments could reasonably be perceived as carrying the force of command influence.

c. Specific phrases within the statements made by the senior leadership

Appellant next contends that it was inappropriate for the senior leadership of the Department of Defense and the Army to use command publications and instructional programs to emphasize the Army's "zero tolerance" policy regarding sexual harassment in the context of a well-publicized investigation and possible trial of service members for sexual abuse of trainees.

The implication of the phrase "zero tolerance" to personnel in the military justice process depends on the training and experience of the person hearing the phrase, as well as the specific circumstances of a case. Compare United States v. Kropf, 39 M.J. 107 (C.M.A. 1994), with United States v. Kirkpatrick, 33 M.J. 132 (C.M.A. 1991); cf. United States v. Wood, 25 M.J. 46 (C.M.A. 1987)(relying in part on Navy's zero tolerance policy to support an informant's reliability in the context of a search and seizure motion). The meaning of "zero tolerance" may range from the relatively benign (e.g., a reminder to not overlook misconduct) to the prejudicial (e.g., an admonition to produce a particular disposition or court-martial result). The record of trial indicates that the persons involved in Appellant's case understood that the military

leadership's discussion of a "zero tolerance" policy on sexual harassment referred to existing Army policy, but did not require a particular disposition. For example, in response to defense counsel's questions during voir dire, Lieutenant Colonel William Paul, III, stated that under the concept of zero tolerance, a person who violated applicable rules would be subject to "appropriate action" in terms of being "counseled, charged -- or investigated and charged, or whatever. But, to me, and especially when you are speaking of soldiers, I think that means that you're not going to make any exceptions as far as rank, or position or anything like that." The responses of the members during voir dire reflected an understanding that the policy stood for the proposition that allegations of sexual harassment should not be ignored; and that the policy did not direct a particular response to an allegation of sexual harassment or otherwise constrain the exercise of discretion with respect to disposition of charges or adjudication of findings or sentence.

Defense counsel interviewed the general court-martial convening authority prior to trial, cross-examined the general and special court-martial convening authorities during trial, and conducted extensive voir dire of the members at trial. In this appeal, Appellant has not demonstrated that those individuals misapprehended the Army's zero tolerance policy on sexual harassment, or that they viewed it as a command

18

expectation to take any particular action or range of actions with respect to disposition of charges or adjudication of the findings and sentence.  In light of the background and experience of the personnel involved in disposition of charges and on the court-martial panel, as well as their responses to questions about the term "zero tolerance," we conclude that the Appellant has failed to demonstrate under Biagase that the phrase "zero tolerance" raised the issue of unlawful command influence in the present case.

Moreover, assuming that Appellant met his burden, the testimony of the forwarding and referring authorities, as well as responses of the panel members on voir dire, demonstrate beyond a reasonable doubt under the third Biagase factor that Appellant's trial was not prejudiced by references to the Army's "zero tolerance" policy under the particular circumstances of this case.  Furthermore, the manner in which the military judge considered these issues at trial rebuts any reasonable inference that references to "zero tolerance" created the appearance of unlawful command influence in this case.

We emphasize that our conclusions are specific to this case, and that the question of whether a "zero tolerance" policy has been presented in a setting that improperly affected the court-martial process must be addressed on a case-by-case basis. See Kropf, 39 M.J. at 109; see also United States v. Baldwin, 54

M.J. 308, 310 (C.A.A.F. 2001); United States v. Brice, 19 M.J. 170, 171-72 (C.M.A. 1985); United States v. Grady, 15 M.J. 275, 276 (C.M.A. 1983).

Appellant further contends that the senior military and civilian leadership improperly influenced the disposition of charges and actions of the court-martial by: (1) using phrases such as "no leniency" and "severe punishment"; (2) asserting as a factual conclusion that there had been an "abuse of power"; and (3) articulating an incorrect legal conclusion -- that "there is no such thing as consensual sex between drill sergeants and trainees."  The media items submitted by Appellant attribute these phrases to the Secretary of the Army, the Assistant Secretary for Manpower and Reserve Affairs, the Chief of Staff of the Army, and other senior leaders.

In the present case, the testimony of the officers involved in the disposition decision and the answers of the panel members during voir dire demonstrate that the persons responsible for prosecutorial discretion and adjudication in Appellant's court-martial were either completely unaware of the foregoing statements or had only a vague recollection of such comments by the senior leadership.  None of these statements were transmitted directly to persons involved in the court-martial process, nor were they communicated through command channels. The phrases at issue were not otherwise repeated or disseminated

in a manner so direct or pervasive as to undermine the reasonableness of the assertions by persons involved in Appellant's court-martial either that they were not aware of such comments or that they did not regard the media reports as reflecting command policy.

Under these circumstances, we conclude that the Government has demonstrated beyond a reasonable doubt that the few media stories in which these phrases appeared did not taint Appellant's court-martial with unlawful command influence. Because the Government has met the third prong of Biagase by showing beyond a reasonable doubt that the court-martial was not unlawfully influenced, we need not determine whether, in the context of the present case, the phrases at issue fit within the first two prongs of the Biagase test.

With respect to apparent unlawful command influence, we take note of: (1) the early action to transfer Appellant to another jurisdiction in light of the potentially improper statements by the commander of the School; (2) the decision to compose the court-martial panel from persons outside the School; (3) the order of the military judge shielding members from media stories about the investigation; (4) the wide variety of disposition decisions in related cases growing out of the investigation at Aberdeen Proving Ground, including dismissal of charges, non-judicial punishment, administrative discharge, and

referral to special as well as general courts-martial; (5) the extensive ventilation of the unlawful command influence allegations at trial through testimony, documentary evidence, briefs, arguments of counsel, and a detailed written decision by the military judge, all of which focused on the impact on subordinate commanders and panel members; and (6) the fact that the defense did not seek a change of venue due to the pretrial publicity or unlawful command influence, nor did the defense challenge any of the panel members on the basis of potential exposure to pretrial publicity or unlawful command influence. In light of these circumstances, the Government has adequately demonstrated that Appellant's trial was not tainted by the appearance of unlawful command influence.

We emphasize, again, that our conclusion reflects the specific circumstances of this case. Whether similar communications in a different context would be prejudicial as a matter of actual or apparent unlawful command influence is a matter that necessarily must be assessed in light of the differing context. In that regard, we note that senior officials and the attorneys who advise them concerning the content of public statements should consider not only the perceived needs of the moment, but also the potential impact of specific comments on the fairness of any subsequent proceedings in terms of the prohibition against unlawful command influence.

## II. INSTRUCTIONS CONCERNING CONSTRUCTIVE FORCE

### A. BACKGROUND

The offenses of rape and forcible sodomy both require proof that the act was committed by force and without consent. Article 120(a); Manual for Courts-Martial, United States (2000 ed.) [hereinafter MCM] Part IV paras. 45.b.(1)(b), 51.b.(3). Although force and lack of consent are separate elements, our case law recognizes that there may be circumstances in which the two elements are so closely intertwined that both elements may be proved by the same evidence. See United States v. Palmer, 33 M.J. 7, 9-10 (C.M.A. 1991)("[C]onsent induced by fear, fright, or coercion is equivalent to physical force."). Such "constructive force may consist of expressed or implied threats of bodily harm." United States v. Hicks, 24 M.J. 3, 6 (C.M.A. 1987). Constructive force may be shown by proof of a coercive atmosphere that includes, for example, threats to injure others or statements that resistance would be futile. See MCM Part IV, para. 45.c.(1)(b).

In the context of the special relationship between non-commissioned officers and trainees, we have observed that the NCO --

> cannot create by his own actions an
> environment of isolation and fear and then
> seek excusal from the crime of rape by

23

United States v. Simpson, No. 02-0001/AR

> claiming the absence of force especially
> where, as here, passive acquiescence is
> prompted by the unique situation of
> dominance and control presented by
> appellant's superior rank and position.

United States v. Clark, 35 M.J. 432, 436 (C.M.A. 1992)(internal quotations and citations omitted). See, e.g., United States v. Cauley, 45 M.J. 353, 356-57 (C.A.A.F. 1996); United States v. Bradley, 28 M.J. 197 (C.M.A. 1989). As noted by the court below, although "rank disparity alone is not sufficient to constitute constructive force[,] the evidence in this case presents far more than mere rank disparity between the appellant and his victims." 55 M.J. at 697 n.40 (citations omitted). The court below identified the following factors demonstrating the relationship between the offenses at issue and Appellant's superior rank and position:

> (1) the appellant's physically imposing
> size; (2) his reputation for being tough and
> mean; (3) his position as a noncommissioned
> officer; (4) his actual and apparent
> authority over each of the victims in
> matters other than sexual contact; (5) the
> location and timing of the assaults,
> including his use of his official office and
> other areas within the barracks in which the
> trainees were required to live; (6) his
> refusal to accept verbal and physical
> indications that his victims were not
> willing participants; and (7) the relatively
> diminutive size and youth of his victims,
> and their lack of military experience.

55 M.J. at 707. Additionally, Appellant used his authority over the victims to issue orders that placed

24

them in the isolated locations where the charged rapes
occurred.  See 55 M.J. at 700-06.

The military judge in the present case provided the members
with detailed instructions on each of the elements.  He also
gave specific instructions on both actual and constructive
force.  With respect to constructive force, he included the
following:

> There is evidence which, if believed, may
> indicate that the accused used or abused his
> military position and/or rank and/or
> authority in order to coerce and/or force
> the alleged victim to have sexual
> intercourse.  In deciding whether the
> accused possibly used or abused his
> position, rank or authority and whether the
> alleged victim had a reasonable belief that
> death or physical injury would be inflicted
> on her and that further resistance would be
> futile under the totality of the
> circumstances, you should consider all the
> evidence presented in this case that bears
> on those issues.

Prior to instructing the members, the military judge
conducted an extensive review of the proposed instructions with
counsel.  During these discussions, the parties and the military
judge addressed the constructive force language in considerable
detail, including deviations from pertinent model instructions
in the Military Judges' Benchbook.  See Legal Services, Dep't of
the Army, Pamphlet 27-9, Military Judges' Benchbook (2001)
[hereinafter Benchbook].  Defense counsel, who raised a number
of concerns about various proposed instructions related to the

25

United States v. Simpson, No. 02-0001/AR

rape charges during these discussions, did not object to the constructive force instruction given by the military judge.  See 55 M.J. at 698.

In the present appeal, Appellant cites the differences between the instruction given by the military judge and the model instruction for the proposition that the instruction at trial was objectionable.  According to Appellant:

> Because the instruction did not inform and limit the panel members on how they could utilize the evidence of the appellant's alleged use or abuse of military authority, the instruction as given permitted a loophole where none was intended to be.  The loophole was large enough so that it permitted the panel members to find the appellant guilty of rape as long as they concluded the appellant used his military power or position to order the alleged victims to have sexual intercourse and sodomy with him, even if the alleged victims had no reasonable belief that death or great bodily harm would be inflicted upon them and had no reasonable belief that resistance would be futile.

B. DISCUSSION

The issue of whether a court-martial panel was properly instructed is a question of law, which we review de novo. United States v. Hibbard, 58 M.J. 71, 75 (C.A.A.F. 2003).  In the present case, the military judge provided instructions on the pertinent elements, and the issue before us is whether the military judge erred by not providing greater specificity or

amplification.  Any such deficiency is waived by defense counsel's failure to object unless the instructions were so incomplete as to constitute plain error.  See United States v. Glover, 50 M.J. 476, 478 (C.A.A.F. 1999).

With respect to deviations from the model instructions in the Benchbook, we note that the military judge was not required to follow literally the non-binding examples therein.  See United States v. Bigelow, 57 M.J. 64, 67 (C.A.A.F. 2002).  The instruction actually given by the military judge, which was discussed in detail with counsel, summarized the general concept of constructive force under our case law.  See, e.g., Cauley, 45 M.J. at 356-57.  If defense counsel believed that further amplification of the law by the military judge was warranted, the time to request such modifications was at trial, when the military judge could have tailored any requested wording to the law and the evidence.  Counsel was actively engaged in the consideration of the instruction at trial.  Under these circumstances, there was no plain error.

We do not agree with Appellant's contention that, even if not waived, the content of the constructive force instruction provided by the military judge was defective.  Appellant suggests that the military judge erred by providing a constructive force instruction referring to fear of "physical injury" rather than fear of "great bodily harm."  Fear of "great

27

bodily harm" is used in the MCM with respect to inferring

consent on the element of lack of consent. See MCM Part IV,

para. 45.c.(1)(b). With respect to the use of constructive

force to prove the element of force, however, we have held that

it is sufficient if the Government proves that the abuse of

authority placed the victim in fear of physical injury. See

Cauley, 45 M.J. at 356 (quoting Palmer, 33 M.J. at 9).

Appellant also suggests that the instruction was deficient

because it failed to focus the attention of the members on

whether the alleged victims had a reasonable belief that they

would be harmed or that resistance would be futile. The

military judge, however, adequately addressed those concerns in

the related instruction he provided on the element of force,

which he gave immediately prior to the constructive force

instruction:

> In the law of rape, various types of conduct
> are sufficient to constitute force. The
> most obvious type is actual physical force,
> that is, the application of physical
> violence or power to compel the victim to
> submit against her will. Actual physical
> force, however, is not the only way force
> can be established. Where intimidation or
> threats of death or physical injury make
> resistance futile, it is said that
> constructive force has been applied, thus
> satisfying the requirement of force.
>
> Hence, when the accused's actions and
> words or conduct, coupled with the
> surrounding circumstances, create a
> reasonable belief in the victim's mind that

> death or physical injury would be inflicted
> on her and that further resistance would be
> futile, the act of sexual intercourse has
> been accomplished by force.

The two related instructions sufficiently informed the members that force was required for the crime of rape, that it could be in the form of constructive force, and that constructive force could be brought to bear on the victim through the use or abuse of military authority that created a reasonable belief that the victim would suffer physical injury or that resistance would be futile.  The military judge was not required to track literally the guidance in the Benchbook.  See Bigelow, 57 M.J. at 67.


III. DECISION

The decision of the United States Army Court of Criminal Appeals is affirmed.