# UNITED STATES NAVY-MARINE CORPS
# COURT OF CRIMINAL APPEALS
# WASHINGTON, D.C.

**Before**
**M.D. MODZELEWSKI, F.D. MITCHELL, J.A. FISCHER**
**Appellate Military Judges**

**UNITED STATES OF AMERICA**

**v.**

**ROGER E. EASTERLY, JR.**
**SERGEANT (E-5), U.S. MARINE CORPS**

**NMCCA 201300067**
**GENERAL COURT-MARTIAL**

**Sentence Adjudged:** 2 October 2012.
**Military Judge:** LtCol Charles Miracle, USMC.
**Convening Authority:** Commanding General, 2d Marine Aircraft Wing, Beaufort, SC.
**Staff Judge Advocate's Recommendation:** LtCol J.J. Murphy, USMC.
**For Appellant:** Capt David Peters, USMC.
**For Appellee:** LCDR Brian C. Burgtorf, JAGC, USN.

**31 January 2014**

---
## OPINION OF THE COURT
---

**THIS OPINION DOES NOT SERVE AS BINDING PRECEDENT, BUT MAY BE CITED AS PERSUASIVE AUTHORITY UNDER NMCCA RULE OF PRACTICE AND PROCEDURE 18.2.**

MITCHELL, Senior Judge:

A military judge sitting as a general court-martial convicted the appellant, pursuant to his pleas, of one specification of adultery in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934. Contrary to his pleas, a general court-martial panel of members with enlisted representation convicted the appellant of one specification of making a false official statement, one specification of assault consummated by a battery, and one additional specification of

adultery in violation of Articles 107, 128, and 134, UCMJ, 10 U.S.C. §§ 907, 928, and 934. The appellant was sentenced to be reduced to pay grade E-1, to forfeit all pay and allowances, to be confined for a period of two years, and to be discharged with a bad-conduct discharge. The convening authority approved the adjudged sentence and, except for the bad-conduct discharge, ordered it executed.

In his sole assignment of error, the appellant contends that the military judge erred by not granting his motion for appropriate relief due to unlawful command influence.[1] The appellant specifically avers that the Heritage Brief given at Marine Corps Air Station (MCAS), Beaufort, by the Commandant of the Marine Corps (hereinafter "CMC") and subsequent White Letters, issued by the CMC, tainted the potential members pool and thereby prevented the appellant from receiving a fair trial.[2]

Having considered the parties' pleadings, the record of trial, and oral argument, we find that the military judge erred as a matter of law in denying the defense motion for appropriate relief. Notwithstanding that determination, we are convinced beyond a reasonable doubt that any unlawful command influence did not affect the fairness of the proceedings against the appellant. Accordingly, we conclude that the findings and sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant occurred. Arts. 59(a) and 66(c), UCMJ.

## I. Background

From 1 December 2011 through 14 January 2012, the appellant, an active duty Marine stationed at MCAS Beaufort, and Ms. B, the spouse of an active duty enlisted Marine deployed to Afghanistan, were involved in an ongoing adulterous relationship. During their adulterous affair, the appellant was fully aware that Ms. B was married to an enlisted Marine, junior in rank to himself, and that he was deployed to Afghanistan. The appellant, although physically separated from his wife, was also legally married during the time of the affair. His

---

[1] Major E.L. Emerich, USMC, heard the motion and issued the ruling.

[2] "Military leaders are prohibited from creating an objective appearance that a court-martial proceeding is unfair. Here, the CMC of the Marine Corps gave a 'Heritage Brief" to many Marines including members of appellant's later court-martial. He declared that 80% of cases like appellant's are 'legitimate sexual assaults' and that they should 'get rid' of Marines suspected of misconduct. Did the military judge err in finding no unlawful command influence and in denying that defense motion?"

2

relationship with Ms. B was the basis for the adultery offense to which the appellant pled guilty.

The remaining charges stem from the events of 14 January 2012, when Ms. B and her friend, Ms. L, met the appellant out in Beaufort, South Carolina, for drinks. Prior to this night, Ms. L had met the appellant twice and had only exchanged pleasantries during those encounters. Through her friendship with Ms. B, Ms. L was fully aware that Ms. B and the appellant were engaged in an adulterous relationship and that they often engaged in rough sex.

That evening, the appellant met Ms. B and Ms. L at a local bar; by this time, Ms. L had already consumed approximately five to six alcoholic drinks and a couple of shots of liquor. After Ms. B and the appellant had an argument, Ms. B and Ms. L left and went to a different bar. The two women continued to consume alcohol before they met up again with the appellant at another bar. By this time, Ms. B was not feeling well and wanted to go home.

Ms. L drove Ms. B back to her on-base residence. During the ride, Ms. B became sick to the point that she vomited out the passenger window. When they arrived at Ms. B's house, she immediately went into the master bathroom and vomited again. While in the house, Ms. B's dog jumped up and bit Ms. L on the chin, breaking the skin, causing her to bleed. The appellant arrived at Ms. B's house shortly thereafter and immediately placed a blanket over Ms. B, who was still sick in the bathroom. He then asked Ms. L what had happened to her chin and she explained that the dog had bitten her. The appellant proceeded to kiss her chin to "make it better." Record at 479-80.

The appellant and Ms. L left Ms. B in the bathroom and went into the kitchen where they drank a couple of shots of whiskey. After Ms. L drank 1½ shots, the appellant kissed her. Ms. L consented to this kiss, but told the appellant "you belong to [Ms. B]." *Id.* at 481. During the kiss, Ms. B walked into the kitchen and saw the appellant and Ms. L kissing, became upset, and went to the master bedroom where she went to bed.

Despite having difficulty walking due to the effects of the alcohol she had consumed, Ms. L managed to find her way to the guest room, leaving the appellant in the kitchen. According to Ms. L, the next thing she remembers is being awakened to a male on top of her, penetrating her vagina. She testified that the man on top of her then began to bite her and call her by Ms. B's name. *Id.* at 483. Ms. L testified that when fully awake, she

3

realized it was the appellant having sexual intercourse with her.

Ms. L testified the appellant began to more forcefully bite her lip, neck, shoulders, down her arms, and her chest. Ms. L stated she told the appellant multiple times that it hurt and told him to stop. Ms. L further testified she tried to push the appellant off of her, but this only made him bite harder and pump his hips faster. Ms. L stated she repeatedly told the appellant to get off of her and to stop. *Id*. According to Ms. L, the encounter went on for about 45 minutes until the dog started barking. Ms. L testified she then asked the appellant to quiet the dog so as to not awaken Ms. B. Ms. L indicated the appellant stopped having sex with her to tend to the dog and this gave her time to get dressed and flee the room.

Ms. L then woke up Ms. B, told her what had happened and that she needed to go to the hospital. Ms. B and Ms. L left the appellant in the house and went to the local hospital's emergency room. At the hospital, a rape kit was done and the Naval Criminal Investigative Service (NCIS) was notified. The appellant was questioned by NCIS on 14 January 2012; during his interrogation and in a subsequent sworn statement, the appellant denied having any kind of sexual encounter with Ms. L.

## II. Procedural Timeline

On 13 February 2012, charges were preferred against the appellant for making a false official statement, two specifications of forcible rape, assault consummated by a battery, and two specifications of adultery. An Article 32, UCMJ, investigation was conducted on 8 March 2012 and two additional specifications of rape were preferred on 19 March 2012. Charges were referred for trial by general court-martial, and the appellant was arraigned on 16 April 2012.

In April 2012, the CMC and Sergeant Major of the Marine Corps embarked on a series of lectures at Marine Corps installations known as the "Heritage Brief." The CMC indicated that his intent was to speak directly with every officer and staff noncommissioned officer (SNCO) in the Marine Corps. The tenor of the brief was that the CMC was disappointed with the lack of accountability for Marines who commit misconduct. Of particular relevance to this case, on 19 April 2012, the CMC presented the brief to officers and SNCOs at Marine Corps Recruit Depot (MCRD), Parris Island; later that day he addressed the same target audience at MCAS Beaufort, South Carolina.

4

In May 2012, the CMC disseminated White Letter 2-12, requesting support from Marine Leadership in combating, *inter alia*, sexual assaults in the United States Marine Corps. In July 2012, the CMC issued White Letter 3-12 explaining that the Heritage Brief and White Letter 2-12 were not designed to influence any Marine's decision at courts-martial or boards of inquiry.

On 13 August 2012 the appellant, through his trial defense counsel, filed a motion for appropriate relief due to unlawful command influence.[3] Appellate Exhibit V. The Government filed its response on 27 August 2012 (AE VI), and the motion was litigated on 11 September 2012. The presiding military judge denied the defense's motion for appropriate relief, stating that there was no actual or apparent unlawful command influence resulting from the CMC's Heritage Brief. Record at 69-71. The appellant's general court-marital was assembled, and his trial began on 25 September 2012.

## III. The Heritage Brief and White Letters

We now turn to the contents of the Heritage Brief and White Letters. The Heritage Brief given at MCRD Parris Island was recorded, transcribed, and offered by the defense on the unlawful command influence motion at trial.[4] The MCAS Beaufort Heritage Brief, given the same day, was not recorded; however, two Marine first lieutenants (1stLt) who attended the MCAS Heritage Brief drafted affidavits detailing, to the best of their recollections, the content of the brief. Much, if not all, of what they remembered the CMC saying was also contained in the MCRD Parris Island transcript, which suggests that the briefs were, in all likelihood, the same or very similar.[5] Excerpts from the transcript from the MCRD brief included the following:

---

[3] The relief requested was a dismissal with prejudice of all referred charges and specifications. In the alternative, the trial defense counsel requested the following potential curative measures from the military judge: an increase in peremptory challenges for a total of four; that the Government receive no peremptory challenges; that no officers or SNCOs sit on the appellant's court-martial panel; and, sentencing limitations in which a punitive discharge or confinement could not be considered by the members.

[4] The military judge refused to consider the verbatim transcript of the Heritage Brief offered at MCRD Parris Island even though it was given on the same day as the brief to officers and SNCOs assigned to MCAS Beaufort. The military judge indicated that the briefs given to the other bases were "too remote and tenuous to be relevant in this case." Record at 51.

[5] The affidavits of 1stLt B and 1stLt C are contained in AE V, pages 38-41.

And I will tell you what, this past year, we had 348
sexual assaults in 2011 and you go - - males in here,
I know exactly what you are thinking: well it's - -
it's not true; it's buyer's remorse; they got a little
bit liquored up and ended up in the rack with
corporal, woke up the next morning, pants were down,
what the hell happened?  Buyer's remorse.  Bullshit.
I know fact.  I know fact from fiction.  The fact of
the matter is: 80 percent of those are legitimate
sexual assaults.  Not all of them are rape, not all of
them - - by the way, none of them are sneaking behind
a bush with a ski mask on and grabbing somebody,
snatching them into the bush.  That's not it.  We have
got Marines that are predators. . . ."

AE V at 50-51.

Accountability; here is my sense. . . . But we have
got a problem with accountability.  I see it across
the Marine Corps.  I see it in the Boards of Inquiry,
they come in, their results and we have got an officer
that has done something absolutely disgraceful and
heinous and the board - - he goes to - - he goes to a
court-martial and he goes before a board of colonels
and we elect to retain him.  Why?  Do I need this
captain?  Do I need this major? I don't.  Why would I
want to retain someone like that?"

I see the same thing with staff NCOs.  You go
before a board and the board sits around, "milk of
human kindness" and misguided loyalty and says this is
a good staff sergeant, this is a good gunny, he's got
17 years in, no mind the fact that he was sleeping
with a corporal and he is married, we already took
him, we have already hammered him, he's got a letter
of reprimand, let's keep him.  Why?  There is a lack
of accountability that just befuddles me with the
commanding officers and the senior enlisted in the
Marine Corps.  And I will tell you that.  I am very,
very disappointed.

I see this stuff in court-martials (sic), I see
it in the behavior and just for the life of me I can't
figure out why we have become so ecumenical?  Why we
have become so soft?  Where we're gonna keep a
sergeant that absolutely doesn't belong in the United
States Marine Corps.  Why would we need to do that?
And the answer is we don't. . . . I got commanding

6

officers of battalions and squadrons and units that are not.  I am not looking for a hatchet job.  This isn't the era of the big axe.  I am just looking for Marines to be held accountable for what they do.  That is what I am looking for.

And I want the staff NCOs in here and I want the officers in here, the commanding officers, and the sergeants major to take a hard look at how we do business.  If you have a Marine that's not acting right, you've got a Marine that deserves to leave the Corps, then get rid of them; it is as simple as that.

*Id*. at 54.

As noted above, the CMC followed up the Heritage Briefs with White Letter 2-12, dated 3 May 2012, addressed to "All Marines," which highlighted that there is no place for sexual assault in the Marine Corps and that it is a crime:

As a Marine Corps, we will take the same approach we have taken to combat the threat of improvised explosive devices over the last eight years and "get to the left of the event."

*Id*.

"The Marine Corps has not spent the last ten years defending our nation's high principles abroad, only to permit this type of behavior within our own ranks!"

*Id*. at 64.  In his own handwriting, the CMC wrote: "Marines . . . leaders . . . I need your immediate attention to this matter!"  *Id*.

About two months later, the CMC sent out White Letter 3-12, which sought to clarify his earlier Heritage Brief remarks. White Letter 3-12 was addressed to: All General Officers, All Commanding Officers, All Officers in Charge, and All Sergeants Major, Master Gunnery Sergeants and Command Master Chiefs.  The subject line of this White Letter read "Leadership" and the CMC stated:

While the Heritage Brief spoke in some detail about the matters of *accountability, discipline, sexual assault and hazing*, I want to be clear about our ever-present responsibilities as senior leaders to uphold the enduring tenets of the Military Justice System.  While the briefings express my strong feelings about "*getting the Corps back on a heading of*

7

*True North*," I am not directing or suggesting specific administrative or military justice actions be taken absent compliance with established law.  My intent is not to influence the outcome or response in any particular case, but rather to positively influence the behavior of Marines across our Corps.  As senior leaders, we have the inherent responsibility to ensure the sanctity of our justice system, this includes the presumption of innocence unless proven otherwise.

*Id.* at 135.

Next, the matter of whether or not a Marine committed a sexual assault and what should happen, will be determined based on the facts presented.  I expect all Marines involved in the military justice process -- from convening authorities, to members, to witnesses -- to make their own independent assessment of the facts and circumstances of each case.

*Id.* at 136.

I've just spent the past two days at Quantico discussing all of these issues with most of the General Officers in our Corps.  I stressed to them the importance of taking sexual assault seriously while fulfilling their responsibilities as Commanders and as Convening Authorities under the UCMJ.  I directed each to ensure that the content and intent behind this White Letter is discussed in detail with each of their commanders and throughout their organizations.

*Id.*

## IV. Unlawful Command Influence

In the wake of the Heritage Brief and two White Letters, the defense filed a motion for appropriate relief alleging both actual and apparent unlawful command influence. AE V.  The motion alleged that the CMC's Heritage Brief and White Letter 2-12 had the effect of tainting the potential members as the target audience was Marine Officers and SNCOs.  Additionally, much of what the CMC discussed in the Heritage Brief and White Letter 2-12 involved the subject of sexual assault -- one of the offenses the appellant was charged with at his general court-martial.

Unlawful command influence has often been referred to as "the mortal enemy of military justice." *United States v. Gore,* 60 M.J. 178, 178 (C.A.A.F. 2004) (quoting *United States v. Thomas,* 22 M.J. 388, 393 (C.M.A. 1986)). Article 37(a), UCMJ, states in relevant part: "No person subject to this chapter may attempt to coerce or . . . influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case . . . ." The mere appearance of unlawful command influence may be "'as devastating to the military justice system as the actual manipulation of any given trial.'" *United States v. Ayers*, 54 M.J. 85, 94-95 (C.A.A.F.2000) (quoting *United States v. Allen*, 33 M.J. 209, 212 (C.M.A. 1991)). "Congress and this court are concerned not only with eliminating actual unlawful command influence, but also with 'eliminating even the appearance of unlawful command influence at courts-martial.'" *United States v. Lewis,* 63 M.J. 405, 415 (C.A.A.F. 2006) (quoting *United States v. Rosser*, 6 M.J. 267, 271 (C.M.A. 1979)). "[O]nce unlawful command influence is raised, 'we believe it incumbent on the military judge to act in the spirit of the Code by avoiding even the appearance of evil in his courtroom and by establishing the confidence of the general public in the fairness of the court-martial proceedings.'" *United States v. Stoneman*, 57 M.J. 35, 42 (C.A.A.F. 2002) (quoting *Rosser*, 6 M.J. at 271). This call to maintain the public's confidence that military justice remain free from unlawful command influence follows from the fact that even the "'appearance of unlawful command influence is as devastating to the military justice system as the actual manipulation of any given trial.'" *United States v. Simpson*, 58 M.J. 368, 374 (C.A.A.F. 2003) (quoting *Stoneman*, 57 M.J. at 42-43). A military judge has the inherent authority to intervene and protect the court-martial from the effects of apparent unlawful command influence.

To raise the issue of unlawful command influence at trial, the defense is required to present "'some evidence'" of unlawful command influence. *United States v. Biagase,* 50 M.J. 143, 150 (C.A.A.F. 1999) (quoting *United States v. Ayala,* 43 M.J. 296, 300 (C.A.A.F. 1995)); *see also Simpson,* 58 M.J. at 373. The defense must "show facts that, if true, constitute unlawful command influence, and that the alleged unlawful command influence has a logical connection to the court-martial, in terms of its potential to cause unfairness in the proceedings." *Biagase,* 50 M.J. at 150 (citations omitted). If the defense meets its burden, the Government must then, beyond a reasonable

doubt, either: (1) disprove the predicate facts on which the allegation of unlawful command influence is based; or (2) persuade the military judge that the facts do not constitute unlawful command influence; or (3) prove at trial that the unlawful command influence will not affect the proceedings. *Id.* at 151.

<u>Military Judge's Ruling</u>

After the trial defense counsel's presentation of evidence in support the unlawful command influence motion, the Government conceded, and the military judge found, that the defense had made a colorable showing of "some evidence" and that the burden shifted to the Government. After reviewing the Government's answer (AE VI) and hearing argument, the military judge made the following "findings" on the record:

> [One:] the CMC of the Marine Corps has a Title 10 - - a U.S.C. Title 10, U.S. Code responsibility to, amongst other things, train, equip, administer, recruit, organize, supply, and maintain the United States Marine Corps. [Two:] There is nothing in the record to suggest the CMC of the Marine Corps has directed or suggested particular - - any particular military justice actions or results contrary to the established law. Three[:] There is nothing to suggest that the CMC of the Marine Corps has attempted to influence the outcome or response to any particular case to include that of the case at bar, that of Sergeant Easterly. Four[:] There is no evidence to suggest [the] CMC of the Marine Corps exerted influence to determine a case based on anything other than the facts presented. Five[:] Nothing suggests Commanding General, 2d Marine Air Wing convened this court in response to anything the CMC has directed. Six[:] Nothing suggests the CMC attempted to use rank or position to change the outcome in any particular case, and certainly not this particular case of Sergeant Easterly. Rather, the CMC of the Marine Corps used his rank and position to reach a wide audience in order to best educate his Corps, which is wholly consistent with his mandated Title 10 responsibilities as the CMC of the Marine Corps. Seven[:] Established case law mandates that the prohibition against UCI is not a prohibition against educating a populace or addressing public or congressional concerns. [Eight:] There is nothing to suggest the CMC targeted members, but rather targeting

10

his leaders to set a standard, and to lead by example, and to discourage sexual assault from ever occurring. Nine[:] CMC spoke to leaders generally, not court-martial members specifically, to insure standards are upheld and no one turns a blind eye to misconduct. Ten[:] There is no logical nexus of the CMC to the particular trial of Sergeant Easterly. In fact, this case is temporally and substantially remote from the CMC of the Marine Corps' remarks. Eleven[:] The reasonable effect and purpose of the Heritage Tour was to uphold longstanding tradition of discipline and professionalism within the Marine Corps, not to influence the court-martial process, achieve a particular result in any particular court-martial, or to achieve a particular result in the trial of Sergeant Easterly.

Record at 69-70.

The military judge further stated: "With the above factors in mind, defense counsel['s] motion to dismiss based on unlawful command influence is denied. Defense requests for other extraordinary remedies, short of dismissal of charges, are also denied." *Id.* at 70. The trial defense counsel then specifically asked the military judge if he was finding no actual or apparent unlawful command influence, and the judge answered in the affirmative. *Id*.

Despite stating that his ruling applied to both, the military judge's findings lack any reference to either actual or apparent unlawful command influence or their respective legal tests. Furthermore, despite the fact that the military judge earlier agreed that the defense had met its initial burden of offering "some evidence" of unlawful command influence, his findings do not address how the Government effectively met its burden of either disproving the predicate facts, proving that those facts did not constitute unlawful command influence, or proving that any unlawful command influence would not affect the fairness of the proceedings. *Biagese*, 50 M.J. at 151. In these regards, the military judge clearly erred.

### Analysis and Discussion

Allegations of unlawful command influence are reviewed *de novo*. *United States v. Harvey*, 64 M.J. 13, 19 (C.A.A.F. 2006); *United States v. Villareal*, 52 M.J. 27, 30 (C.A.A.F. 1999); *United States v. Wallace*, 39 M.J. 284, 286 (C.M.A. 1994). Our review of whether the conduct of the CMC in this case created an

11

appearance of unlawful command influence is determined objectively. *Lewis,* 63 M.J. at 415 (citing *Stoneman*, 57 M.J. at 42). The objective test for the appearance of unlawful command influence is similar to the tests we apply in reviewing questions of implied bias on the part of court members or in reviewing challenges to military judges for an appearance of conflict of interest. *Id.* "We focus upon the perception of fairness in the military justice system as viewed through the eyes of a reasonable member of the public. Thus, the appearance of unlawful command influence will exist where an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding." *Id.*

Although the appellant focuses his appeal on the issue of apparent unlawful command influence, our review on appeal must necessarily consider whether actual unlawful command influence was present in these proceedings as well as whether any apparent unlawful command influence tainted the appellant's trial. *Simpson*, 58 M.J. at 374, 377; *Stoneman*, 57 M.J. at 42-43.

Since both parties and the military judge agreed at trial, we will assume without deciding that the evidence offered on the defense motion was "some evidence" sufficient to raise the issue of unlawful command influence. Consequently, the burden shifts to the Government to prove beyond a reasonable doubt that "the fairness of the proceeding was not compromised by any unlawful command influence." *United States v. Reed*, 65 M.J. 487, 491 (C.A.A.F. 2008). We note, however, that the military judge's ruling occurred early in the trial, prior to *voir dire* and assembly. In conducting our *de novo* review, we have the benefit of the complete record of trial.

### Actual Unlawful Command Influence

The appellant does not contend and we do not find any evidence of actual unlawful command influence at trial or on appeal. Major Emerich, the military judge who heard and decided the unlawful command influence motion, was replaced by Lieutenant Colonel (LtCol) Miracle for the trial. LtCol Miracle did not restrict *voir dire* and liberally granted challenges for cause, excusing nine of the 16 original members. Seven potential members were dismissed as a result of challenges for cause by the trial counsel, and the defense objected to the removal of only one of them. The military judge sufficiently explained on the record his concern for actual and implied bias concerning this potential member and granted the challenge. The

12

panel members who either heard the CMC's Heritage Brief or read White Letter 2-12 were questioned during *voir dire* with respect to whether either would have an adverse impact on their ability to render an impartial judgment. *See Stoneman,* 57 M.J. at 41. The members' answers demonstrated that they did not feel any pressure as a result of the CMC's Heritage Brief or White Letters, and there is no evidence that they believed they had to achieve a certain outcome or an expected result from the appellant's court-martial. We also note that no member of the appellant's court-martial panel was challenged for cause by the defense based on attendance at the Heritage Brief or because they had read the White Letters.[6] Record at 153-266 and 283-350. Finally, we have found nothing in the record to suggest that the CMC's Heritage Brief and White Letters improperly influenced either the convening authority, staff judge advocate, or anyone else associated with the appellant's trial, to include the members. We find beyond a reasonable doubt that the case was not infected by actual unlawful command influence.

Apparent Unlawful Command Influence

Assuming without deciding that the Heritage Brief created the appearance of unlawful command influence, we now consider whether the Government has demonstrated beyond a reasonable doubt that the fairness of any aspect of the proceedings was not compromised.[7]

In terms of apparent unlawful command influence on the merits, we find that the Government has met its burden and we find no apparent unlawful command influence as it relates to the members' findings. The best indicator of the lack of apparent unlawful command influence on the merits is the fact that the

---

[6] Of the members that were seated as part of the appellant's court-martial panel, three were challenged for cause by the defense based upon their responses to questions at *voir dire*: Chief Warrant Officer J, Gunnery Sergeant (GySgt) M, and GySgt J. None was challenged for unlawful command influence as a result of the Heritage Brief and White Letters. With respect to these members, the military judge denied each challenge for cause, and they sat as members of the appellant's court-martial panel.

[7] The appellant has not raised, and we do not find, that the Article 32, UCMJ, investigation conducted in this case and pretrial processing of the appellant's case for trial by general court-martial were tainted by the CMC's comments, as the Heritage Briefs and release of the White Letters occurred post-referral. We also note here that the record contains an affidavit by the convening authority, Commanding General, 2d Marine Aircraft Wing, which indicates that, although he attended the Heritage Brief and read the White Letters, the CMC's comments would not influence him in executing his post-trial responsibilities. We do not find, and the appellant has not alleged, any prejudice in his post-trial processing by the convening authority.

appellant was acquitted of both specifications of rape, the most serious offenses on the charge sheet and a principal focus of the CMC's comments during the Heritage Brief and White Letters. Additionally, the trial defense counsel, in arguing against a finding of guilty on the rape specifications, conceded in closing argument that the appellant had sex with Ms. L (adultery) and that he bit her multiple times after she told him to stop (assault consummated by a battery):

> And that's what the facts truly indicate. Sure, this is adultery. Okay. [The appellant] was married. He had sex with Ms. [L]. Got it. Adultery. Fine. I would agree this is assault, too. I mean, he bit her or sucked on her. She didn't want it. That's an unlawful touching. So [the appellant] assaulted her and that assault was consummated by battery, touching, unlawful touching.

Record at 814. In conceding the adultery charge, the trial defense counsel implicitly conceded guilt on the false official statement charge, in which the appellant disavowed having sexual relations or intercourse with Ms. L. Finally, we find that the evidence submitted at trial was more than sufficient to support the member's findings of guilty beyond a reasonable doubt. Thus we are convinced beyond a reasonable doubt that a disinterested observer would not harbor a significant doubt as to the fairness of the proceeding.

We are likewise convinced beyond a reasonable doubt that the sentence was not affected by any apparent unlawful command influence. Factors that shaped our decision in this regard include the lack of any indication in the record that any witnesses failed or refused to testify on the appellant's behalf because they felt intimidated or discouraged from participating in the trial. On the contrary, the evidence presented by the defense in extenuation and mitigation included statements from a warrant officer and two noncommissioned officers who provided favorable evidence on the appellant's behalf. Defense Exhibit B at 1-4.

In his assignment of error, however, the appellant specifically avers that his sentence, which included a bad-conduct discharge, total forfeitures, reduction to pay grade E-1, and two years' confinement is an overly harsh sentence and therefore this court cannot be convinced beyond a reasonable

14

doubt that apparent unlawful influence had no impact in his case.[8]  Appellant's Brief of 8 Jul 2013 at 39-40.  We disagree.

The appellant was sentenced for committing the following misconduct: making a false official statement; assault consummated by a battery; and, two specifications of adultery. These offenses carry a maximum punishment of seven years and six months confinement, reduction to pay grade E-1, total forfeitures, and a bad-conduct discharge.  During argument, the trial counsel asked for the maximum sentence; the appellant, in his unsworn statement and argument on sentence made by the trial defense counsel, did not specify a particular punishment but asked for an appropriate sentence.  Record at 866, 867, 870-73.

During the presentencing case in aggravation, the members heard testimony from Corporal (Cpl) B, Ms. B's active duty Marine husband, who was deployed to Afghanistan during the time the appellant had the adulterous affair with his wife.  Cpl B testified about his emotional reaction upon being given the news of the affair, resulting in his weapon being temporarily removed from him.  *Id.* at 850.  He also indicated that he couldn't eat or sleep, lost a significant amount of weight, and asked to remain in theater rather than return stateside.  *Id.* at 852. Additionally, Cpl B spoke of the betrayal he felt after discovering that the man having the adulterous affair with his wife was not only a Marine, but a fellow NCO as well.  *Id.*

The members were also able to consider during their sentencing deliberations the graphic pictures of Ms. L taken after the assault, which depicted extensive bruising and bite marks on much of her upper body.  Additionally, the government presented the testimony of Ms. L's brother, who substantiated the gravity of her injuries.

At the conclusion of the presentencing case by both sides and after hearing argument, the military judge properly instructed the members.  The members are presumed to have followed these instructions. *United States v. Pollard*, 38 M.J. 41, 52 (C.M.A. 1993) (citing *United States v. Ricketts*, 1 M.J. 78, 82 (C.M.A. 1975)).  We are not persuaded that the CMC's Heritage Brief and White Letters caused the members to award the appellant a more severe sentence than they would have adjudicated otherwise.  We are convinced beyond a reasonable doubt that appellant's sentence was not tainted by apparent unlawful command influence.  We are convinced beyond a reasonable doubt that an objective, disinterested observer,

---

[8] The appellant has not made an assignment of error averring sentence severity.

fully informed of all the facts and circumstances, would not harbor a significant doubt as to the fairness of the appellant's court-martial, to include the adjudged sentence. Accordingly, we decline to grant relief.

## V. Conclusion

The findings and sentence as approved by the convening authority are affirmed.

Chief Judge MODZELEWSKI and Judge FISCHER concur.


For the Court



R.H. TROIDL
Clerk of Court

16