**UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS**

**UNITED STATES**

**v.**

**Staff Sergeant LUIS A. WALKER**
**United States Air Force**

**ACM 38237**

**15 May 2014**

Sentence Adjudged 21 July 2012 by GCM convened at Joint Base San
Antonio-Lackland, Texas. Military Judge: Terry A. O'Brien and J. Wesley
Moore.

Approved Sentence: Dishonorable discharge, confinement for 20 years, and
reduction to E-1.

Appellate Counsel for the Appellant: Major Matthew T. King;
Captain Jeffrey A. Davis; and Dwight H. Sullivan, Esquire.

Appellate Counsel for the United States: Colonel Don M. Christensen;
Lieutenant Colonel C. Taylor Smith; and Gerald R. Bruce, Esquire.

Before

HARNEY, HECKER, and MITCHELL
Appellate Military Judges

OPINION OF THE COURT

This opinion is subject to editorial correction before final release.

HECKER, Judge:

Contrary to his pleas, the appellant was convicted at a general court-martial of
attempted aggravated sexual contact, violation of a lawful general regulation, rape,
aggravated sexual assault, obstruction of justice, and adultery, in violation of Articles 80,
92, 120 and 134, 10 U.S.C. §§ 880, 892, 920, 934.[1]  Officer and enlisted members

[1] The court-martial order (CMO) fails to include the original language of Specification 11 of Charge II, on which the
appellant was arraigned, and fails to delineate how that Specification was modified by the military judge's ruling
pursuant to Rule for Courts-Martial 917. *See* Air Force Instruction (AFI) 51-201, *Administration of Military Justice*,

sentenced him to a dishonorable discharge, confinement for 20 years, forfeiture of all pay and allowances, and reduction to E-1. The convening authority disapproved the forfeitures and approved the remainder of the sentence as adjudged.

The appellant raises multiple issues on appeal. He contends the military judge erred in (1) Denying the defense's unlawful command influence motion; (2) Allowing a witness to testify that investigators had verified the accuracy of her statement; (3) Refusing to give a defense-requested instruction concerning the "placing in fear" component of aggravated sexual assault; (4) Denying a defense motion for certain mental health records; and (5) By overruling a defense objection to testimony indicating that the defense did not participate in the Article 32, UCMJ, 10 U.S.C. § 832 investigation.[2] The appellant also argues the evidence is factually and legally insufficient to prove the appellant engaged in unlawful sexual contact with trainees, and that cumulative error requires his findings and sentence to be set aside. Pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), the appellant further contends the evidence is factually and legally insufficient to sustain any of his convictions and that prosecutors in his case committed prosecutorial misconduct.

Finding no error materially prejudicial to the substantial rights of the appellant, we affirm.[3]

*Background*

Beginning in October 2010, the appellant was assigned as a military training instructor (MTI) at Joint Base San Antonio-Lackland, responsible for overseeing the eight-week basic training of civilians entering active duty as enlisted Airmen. Another MTI and several of the trainees testified about the training environment and how enlistees are treated from the moment they arrive for in-processing at the base. During arrival briefings, the trainees are told the MTIs are the supervisors whose orders they would be following over the next eight weeks. After completing some paperwork at the reception center, the trainees are bused to the 326th Training Squadron complex, where almost all their training would take place. The trainees are rushed off the bus in a manner designed to overload their senses and disorient them. A goal of the MTIs in this process is to establish dominance over the trainees and to demonstrate the MTIs' orders are not to be questioned. The trainees are kept off-balance through fast-paced, loud instruction, and a

---

¶ 10.8.2.2 (6 June 2013). Further, the CMO erroneously spells out the names of the victims in the specifications when it should only give victims' initials. *See* AFI 51-201, ¶ 10.7.1.2. Accordingly, we order promulgation of a corrected CMO.

[2] Two different judges were detailed to this case with one (Judge O'Brien) handling most of the pretrial Article 39(a), UCMJ, 10 U.S.C. § 839(a) sessions and another (Judge Moore) handling the findings and sentencing portion of the court-martial.

[3] Before reaching this conclusion, we considered the arguments raised in the briefs filed by the appellate defense counsel and the briefs filed by the appellant personally pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

series of tasks. Several trainees described this experience as "utter chaos," "awful," "scary," "confusing," and "nerve-racking."

For the first several weeks of training, the MTIs' interaction with the trainees generally involves yelling at and correcting them. Over time, the MTIs transition into a "building" mode, where trainees are expected to recognize and correct problems without the MTIs' constant direction, but the MTIs are still heavily involved with the trainees. It is up to each individual MTI to determine how to handle his/her flight of 50-55 trainees, sometimes in conjunction with the MTI assigned to the "brother" or "sister" flight that was co-located nearby in the dormitory. Trainees who have performance or discipline difficulties are required to repeat portions of the training (known as being "recycled") or fail out of the program. If the MTIs' trainees continue to progress through training, the MTIs' supervisor would not become involved in the flights' daily operations. Therefore, MTIs had a great deal of autonomy and independence in how they guide, discipline, and interact with trainees throughout their basic training.

As part of their own in-processing, MTIs are briefed by the squadron commander about the prohibitions against MTI/trainee relationships and sexual harassment of trainees. These prohibitions are found in the 737th Training Group Instruction 36-3 and Air Education Training Command (AETC) Instruction 36-2909. All MTIs must certify in writing that they understand these instructions, agree to abide by them, and understand they are subject to prosecution or other discipline for any violations. The appellant signed his initial certification in October 2010 and recertified in January and May 2011.

These instructions prohibited MTIs from engaging in sexual harassment, as well as, "establish[ing], develop[ing], attempt[ing] to develop or conduct[ing] a personal, intimate, or sexual relationship with a trainee," which includes "dating, handholding, kissing, embracing, caressing, and engaging in sexual relationships" conducted in person or through any means of communication. By signing the certification, MTIs acknowledge the nature of their work places them in a position to "take advantage of trainees." Therefore, they have the responsibility to ensure their relationships with trainees "are at all times professional and impartial." MTIs specifically agree they "will not use [their] grade or position, threats, pressure, or promise of return of favors or favorable treatment in an attempt to gain sexual favors" from a trainee, "will not make sexual advances toward, or seek or accept sexual favors from, a trainee," and "will not develop (or attempt to develop), establish, or maintain a personal social relationship" with trainees. To ensure a proper training environment, MTIs cannot be alone in a vehicle or behind closed doors with a trainee of the opposite gender, and trainee dormitories are off-limits to opposite gender MTIs during certain time periods.

After the appellant had worked as an MTI for approximately eight months, agents from the Air Force Office of Special Investigations (AFOSI) learned one of the female trainees from the appellant's flight was alleging he had sexually assaulted her. In the

course of their investigation, AFOSI agents learned of additional allegations involving the appellant and other female trainees.

The appellant was ultimately charged with engaging in inappropriate conduct with ten female trainees over an eight-month period. Some of the women were trainees in the appellant's flight, while others were part of a "brother flight" associated with the appellant's flight. The alleged misconduct ranged from suggestive comments to rape.

*Unlawful Command Influence*

The defense moved to dismiss the charges based on apparent unlawful command influence, relying largely on an *Air Force Times* cover story article about the appellant's case. According to that article, the training group commander called any sexual advance by a trainer illegal and immoral and said he planned to "stamp out what has become a scourge" on his organization. The commander also referred to the appellant, noting that "we have a problem" related to him, and "I have to absolutely get rid of this cancer within" basic military training. The article concluded by quoting the commander as saying, "An overwhelming majority of instructors are the best noncommissioned officers the Air Force has to offer . . . but several are sullying the name. I've got to get them out. They don't belong." Another MTI in the appellant's squadron sent this article to the entire squadron with a cover message that stated, "Sergeant Walker has made a grand appearance and is currently in the AF Times, so expect questions." The appellant argued there was an environment of presumed guilt within the training squadron, and the chilling effect had discouraged defense witnesses from participating on the appellant's behalf in his trial proceeding.[4]

The Government opposed the motion and presented evidence on the issue, including an affidavit from the commander regarding his comments in the *Air Force Times*, and testimony from a technical sergeant in the squadron stating he had not observed any discouragement by squadron leadership about participating in the trial process on the appellant's behalf. The Government also submitted several other affidavits regarding why various individuals chose not to provide character letters for the appellant.

The military judge denied the defense motion and found the following: 1) The commander did not intend to convey any opinion regarding the appellant's guilt or any particular punishment the appellant should receive if he was convicted; 2) The commander's comments were "taken out of context," but a "fair reading" of the comments attributed to the commander "reasonably creates the impression of a presumption of guilt" regarding the appellant; 3) The MTI who sent the article to the

---

[4] The appellant's original motion also claimed the existence of actual unlawful command influence but the appellant withdrew that aspect of his motion. At the Government's request, the military judge nonetheless made findings of fact and conclusions of law related to both types of command influence.

entire squadron was not directed to do so by squadron leadership and instead was acting on his own initiative to alert members that media inquiries could be imminent; and 4) There was no evidence the commander or other members of squadron leadership actively discouraged participation as a defense witness and no evidence that the news article or command environment prevented, discouraged, or impacted individuals' willingness to assist the defense. Under those facts, the military judge concluded there was no actual or apparent unlawful command influence present. The appellant contends the military judge erred in denying the defense's unlawful command influence motion by failing to apply the required legal analysis and procedure. He argues her ruling does not properly explain how she reached her conclusion, and that the remedy for this error should be dismissal of the findings and sentence in his case. We disagree.

Article 37(a), UCMJ, 10 U.S.C. § 837(a) states in relevant part: "No person subject to this chapter may attempt to coerce or . . . influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case . . . ." The mere appearance of unlawful command influence may be "as devastating to the military justice system as the actual manipulation of any given trial." *United States v. Ayers*, 54 M.J. 85, 94-95 (C.A.A.F. 2000) (internal quotation marks and citation omitted). "Even if there was no actual unlawful command influence, there may be a question whether the influence of command placed an intolerable strain on public perception of the military justice system." *United States v. Lewis*, 63 M.J. 405, 415 (C.A.A.F. 2006) (internal quotation marks and citation omitted). "Whether the conduct of the [commander] in this case created an appearance of unlawful command influence is determined objectively." *Id*. Because the focus is on the perception of fairness as viewed through the eyes of a reasonable member of the public, "the appearance of unlawful command influence will exist where an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding." *Id*.

At trial, the burden of raising the issue of unlawful command influence rests with trial defense counsel. *United States v. Biagase*, 50 M.J. 143, 150 (C.A.A.F. 1999). The defense must: (1) "show facts which, if true, constitute unlawful command influence," and (2) show "the alleged unlawful command influence has a logical connection to the court-martial, in terms of its potential to cause unfairness in the proceedings." *Id*. (citation omitted). To meet the threshold for raising this issue, trial defense is required to present "some evidence" of unlawful command influence. *Id*. If the defense meets that burden to raise the issue, the burden shifts to the Government, who must: "(1) [D]isprove the predicate facts on which the allegation of unlawful command influence is based; (2) [P]ersuade the military judge that the facts do not constitute unlawful command influence; or (3) [P]rove at trial that the unlawful command influence will not affect the proceedings." *United States v. Simpson*, 58 M.J. 368, 373 (C.A.A.F. 2003) (internal quotation marks and citation omitted). "Whichever tactic the Government chooses, the quantum of proof is beyond a reasonable doubt." *Id*.

The military judge's ruling, as well as the parties' motions, cites *Biagase* and related cases on unlawful command influence. Although the military judge's ruling does not expressly cite the "some evidence" and "beyond a reasonable doubt" language, when her holding is considered in its entirety, we find she did properly apply that case law to the evidence presented before her on this motion. "[M]ilitary judges are presumed to know the law and to follow it, absent clear evidence to the contrary." *United States v. Mason*, 45 M.J. 483, 484 (C.A.A.F. 1997). Furthermore, even if the appellant met his burden in this regard, we conclude under the circumstances of this case, the Government has met its burden of demonstrating beyond a reasonable doubt that the fairness of the court-martial proceedings was not compromised by any unlawful command influence. *United States v. Wallace*, 39 M.J. 284, 286 (C.M.A. 1994) ("Where the issue of unlawful command influence is litigated on the record, the military judge's findings of fact are reviewed under a clearly-erroneous standard, but the question of command influence flowing from those facts is a question of law that this Court reviews *de novo*."). An objective, disinterested, reasonable member of the public, fully informed of all the facts and circumstances, would not harbor a significant doubt about the fairness of the appellant's court-martial proceeding.

Pursuant to *Grostefon*, the appellant also argues his findings and sentence must be dismissed with prejudice "where unlawful command influence from senior Air Force leaders and members of Congress undermined [the] substantial rights of the appellant." He notes that since his trial, his case has received a significant amount of media attention and "a number of major actions taken by Air Force senior leaders and members of Congress have put pressure on commanders . . . to ensure that the Military Training Instructors received significant punishment." He contends that military and civilian leaders have undermined the military justice system "by making public attacks and setting a standard through [the] media." We do not find these materials to constitute sufficient evidence of actual or apparent unlawful command influence.

*Factual and Legal Sufficiency of the Aggravated Sexual Assault Specifications*

Among other offenses, the appellant was convicted of six specifications of aggravated sexual assault involving five female trainees.[5] At the time of the appellant's offenses, Article 120(c), UCMJ, 10 U.S.C. § 920(c) stated a person is guilty of aggravated sexual assault if he "causes another person . . . to engage in a sexual act by . . . placing that other person in fear (other than [a] fear that any person will be subjected to death, grievous bodily harm, or kidnapping) . . . ." *Manual for Courts-Martial, United States* (*MCM*), Part IV, ¶ 45.a.(c)(1)(A) (2008 ed.). The term "placing that other person in fear" was defined as "a communication or action that is of sufficient consequence to cause a reasonable fear that non-compliance will result in the victim . . . being subjected

---

[5] By the time of trial, each of the women was serving on active duty.

to, [among other things], a threat . . . through the use or abuse of military position, rank, or authority, to affect or threaten to affect, either positively or negatively, the military career of [the victim]." *MCM*, Part IV, ¶45.a.(t)(7).[6]

The specifications in this case used that language, alleging the appellant caused the women to engage in certain sexual conduct "by placing [them] in fear of an impact on [their] military career through the use and abuse of [his] military rank, position, and authority." The appellant contends the evidence is factually and legally insufficient to establish that he committed these sexual acts by placing the women in that fear. We disagree.[7]

*Trainee CM*

The appellant's first inappropriate sexual contact with a female trainee occurred soon after he took over his MTI duties.[8] CM was an 18-year-old trainee in the appellant's "brother flight."

The appellant began his inappropriate conduct with CM early in her training by making a suggestive comment about her walk which she tried to "laugh . . . off." Later, after calling her out of her dormitory bay and into a nearby stairwell, he talked to her

---

[6] Prior to this enactment, these types of allegations were generally prosecuted as rape by "constructive force." This theory of culpability was created through military case law to cover scenarios where the force utilized by the perpetrator against the victim was not direct physical force. *United States v. Leak*, 61 M.J. 234, 246 (C.A.A.F. 2005). A perpetrator could be found to have used such "constructive force" against a victim "through the use or abuse of military authority that created a reasonable belief that the victim would suffer physical injury or that resistance would be futile," under the totality of the surrounding circumstances. *United States v. Simpson*, 58 M.J. 368, 379 (C.A.A.F. 2003); *Leak*, 61 M.J. at 247. In a training situation, one of those circumstances can be the presence of a "coercive environment," which may prompt a trainee's "passive acquiescence [due to] the unique situation of dominance and control presented by [the perpetrator's] superior rank and position." *Simpson*, 58 M.J. at 377 (citing *United States v. Clark*, 35 M.J. 432, 436 (C.M.A. 1992)); *United States v. Bradley*, 28 M.J. 197, 200 (C.M.A. 1989) (determining that intercourse or sodomy extracted from a victim junior in rank and authority to the accused can be criminal if it occurs through "a unique situation of dominance and control where explicit threats and display of force by the military superior were not necessary").

[7] Pursuant to *Grostefon*, the appellant alleges the evidence is actually insufficient to sustain his conviction on *all* charges and specifications because that evidence shows significant problems with the trainees' credibility. We disagree and find the evidence both factually and legally sufficient to sustain all charges and specifications in the case, including those that involve these five women (aggravated assault, adultery, violation of a lawful general regulation and obstruction of justice).

[8] The appellant was also convicted of misconduct with another young woman, CW, who was in training with the appellant's brother flight during this same time frame. Specifically, he was convicted of violating a lawful general regulation by wrongfully seeking to develop a personal, intimate, or sexual relationship with CW by making sexually suggestive comments about her tattoo and her body, placing her on a dorm bed, and unprofessionally communicating with her via text messages while she was in a training status. While alone in the dormitory with the appellant, he asked her about her questions about her tattoos and commented on her body. He then searched her belongings in an effort to find a phone card that could contain photographs of it. He tried to get CW to enter the bathroom with him and when she refused (because she felt uncomfortable), he picked her up, put her over his shoulder, and threw her onto the bed. Again feeling uncomfortable, she pushed him and tried to laugh it off. He told her "it's only cheating if you get caught, and if anything happens, it stays here." The appellant also communicated with her multiple times via text messages while she was still a trainee.

about stress and concluded the conversation by raising his arms for a hug. CM testified that she was hesitant but decided to hug him as she was unsure of the consequences she would face if she refused. When she tried to pull away following the hug, he continued to hold onto her and then kissed her on the lips.

Near the end of her training, the appellant called CM out of her dormitory and told her to follow him to his office. CM stood in his office at parade rest and the appellant closed the door. After some small talk, the appellant walked over to his bed and gestured for her to join him. She testified that she said "no" several times while trying to be polite because she knew he was a staff sergeant who was appointed over her as an authority figure. The appellant reached out and pulled her over to the bed. He asked her to remove her clothes, but she said "no" several times. CM's pants were eventually pulled down, though she could not remember precisely how that happened. The appellant laid her down on the bed, pulled his pants down and had sexual intercourse with her. When he was done, he pulled up his pants and told her not to tell anyone. She agreed and then left.

CM tearfully testified that she did not say anything further during the intercourse incident because "I felt there was nothing that I could say." She also testified, "I would have never been in that flight office in that situation had he not been appointed over me." She did not tell anyone about what had happened as she just wanted to leave basic training and was not ready to accept what happened.

For his act of sexual intercourse with CM, the appellant was convicted of aggravated sexual assault (by placing her in fear of an impact on her military career) and adultery. He was also convicted of violating a lawful general regulation by wrongfully seeking to develop a personal, intimate, or sexual relationship with CM by hugging her, attempting to kiss her and engaging in sexual intercourse with her.

*Trainees LV and SR*

Another group of trainees underwent training between January and March, including 18-year-old LV and 19-year-old SR. The appellant was the MTI for SR, and LV was in his "brother flight." They both described a similar pattern of misbehavior by the appellant where he ordered the women to report to his office, initiated inappropriate contact and communications with them, and then later escalated to digital penetration and/or vaginal intercourse.

With both women, the appellant's first inappropriate behavior began when he kissed them after they reported in to his office at his direction. He put his hands on LV's shoulders and tried to kiss her as she turned around from completing a task he had directed. LV turned her head and the kiss landed on her cheek. With SR, the appellant called her into his office on multiple occasions and directed her to write reports on what she ate for lunch. She did not question the propriety of that task. At one point, he asked

SR how he could find her on Facebook and said they could be friends when she left basic training. Then, while she was standing at attention, he hugged her and kissed her cheek. Both women described themselves as surprised by the appellant's behavior, with SR testifying she was "astonished" at the physical contact and "wasn't sure how [she] felt about [his comments] because [an MTI] trying to get to know you seems a little weird, but at the same time who are you to question it."

The appellant soon called the women back into his office at separate times and engaged in sexual contact with them. With LV, he directed her to go to an empty dorm room in another building, pushed her down on the bed, pulled down her uniform pants, and digitally penetrated her. Several weeks later, he directed LV to a flight office in an empty dorm, grabbed her hand, pulled her to the bed, removed his pants, and engaged in sexual intercourse with her. With SR, he kissed her neck and lips, groped her breasts while she stood "frozen" at attention, and, several weeks later, he pulled her onto his lap, again kissed and groped her and then digitally penetrated her. The acts of digital penetration and sexual intercourse served as the basis for the aggravated sexual assault specifications involving LV and SR.

Both women testified about their state of mind surrounding these incidents. LV testified that she went to the room with the appellant as "you don't have a choice to say 'no, I don't want to' in basic." She initially told the appellant "no" during the digital penetration incident but then "just laid there" as the act occurred. During the sexual intercourse incident, LV testified that "I knew . . . what he wanted" and that she did not say anything or try to physically resist because "I felt that I couldn't do anything so it would just be quicker to just go along with it." She testified that the appellant did not explicitly threaten her or her career if she refused his advances, but that, as a trainee with little control over her day-to-day life, she was scared of all MTIs and was "not in the mindset to not do what you think you're wanted to do." No one in LV's family had ever been in the military, and at the time of the incidents, she said she was still adjusting to the military structure and felt "all you know is [MTIs] tell you what to do and that's their job, and it's your job to listen." She "felt like [she] could never say no to this MTI." She was concerned that if she upset the appellant by resisting his advances, he would make an adverse change in her life as she recognized that MTIs, including the appellant, had control over her daily training experience and her ability to graduate, based on their rank and position.

Similarly, SR testified that she elected not to report the appellant when he first kissed her "because making an accusation against [an MTI], that's big . . . . [MTIs] are the ones that you're trusting. They're telling you, you can be recycled for anything, or kicked out . . . . [W]e were briefed once that inappropriate interactions with [an MTI] was wrong. So I assumed that I was in the wrong for being there and I thought that I would get in trouble over it, and I didn't want to bark up that tree." When the appellant later grabbed her breasts, she chose to keep this situation to herself because she was going to

graduate soon from basic training and did not want to cause the appellant to recycle her through the program again. During the digital penetration situation, she testified that she feared for her physical safety as the situation was developing but did not yell out for help because of what could happen if she did, including having her military "career . . . go down the drain." She described the situation as "nerve-racking. I didn't want to be kicked out, and then later he pulled me aside . . . and he told me that if I told anyone about it that I would get kicked out with a dishonorable discharge." SR believed she was the one who would have problems if she said anything.

For his acts of digital penetration and sexual intercourse with LV, the appellant was convicted of two specifications of aggravated sexual assault and adultery. He was also convicted of violating a lawful general regulation by wrongfully seeking to develop a personal, intimate, or sexual relationship with LV by kissing her cheek, pushing her on a bed, and digitally penetrating her vagina.

For digitally penetrating SR, the appellant was convicted of aggravated sexual assault (by placing her in fear of an impact on her military career). He was also convicted of violating a lawful general regulation by wrongfully seeking to develop a personal, intimate, or sexual relationship with SR by hugging her, kissing her cheek and neck, groping her breasts, and digitally penetrating her vagina.

*Trainee AJ*

Another group of individuals went through basic training from March through May 2011. One of them was AJ, a 20-year-old trainee in the appellant's flight.[9] During in-processing, the appellant told the trainees he was now in charge of them (like their parents had been) "and he was pretty much God to us." AJ testified that, in her view, nobody could tell the appellant what to do and he would get away with anything he did.

As he had with the other trainees, the appellant began his misconduct with AJ through suggestive and inappropriate comments. After he called her into his office to discuss a discipline matter, he asked about her family. When he learned how many siblings she had, he said "your parents must not have had TV," which made her feel awkward as she had never had such a personal conversation with other MTIs. He also told her she had a pretty face and should keep her head up while marching, which she

---

[9] The appellant was also convicted of misconduct with two other young women who were in basic training during this same time frame as members of his flight. Specifically, the appellant was convicted of violating a lawful general regulation by wrongfully seeking to develop a personal, intimate, or sexual relationship with a trainee named AS by looking at sexually suggestive photographs of her and telling her that she was "hot" and "should have been naked." He was convicted of violating that same regulation by allowing another trainee named VS to use her personal email and Facebook account from inside his office on divers occasions, telling her she was "hot," that he "loved country girls," and "would keep her secrets if she would keep his," and then later engaging in consensual sexual acts (vaginal intercourse, oral sodomy and anal sodomy) with VS. He was also convicted of committing adultery with VS.

took to be an effort to motivate her.  Later, when some other female trainees were making fun of her, he told them "she's not like that.  She likes her hair pulled," which embarrassed her because it seemed to be a sexual innuendo.

The sexual contact between the appellant and AJ occurred on her last day of training.  Immediately following graduation, the appellant asked AJ and two other female trainees to help clean up the flight office.  He asked her if she thought any of the MTIs were "cute" and while she was out of the room, the appellant got her contact information from her cell phone and began texting her, asking about her bra size.[10]  AJ testified that she did not believe she could refuse to let the appellant handle her phone.

The appellant then directed AJ to go downstairs to a supply room for some cleaning supplies.  He followed her and closed the door.  Becoming suspicious of his intentions and describing herself as "a little bit taken aback," she asked "I'm not getting bleach, am I?"  He smiled, walked up to her, and kissed her while she stood there "shocked."  He then guided her over to a couch in the supply room.  She did not say anything because "I was scared.  I didn't know what to.  I didn't know how to react.  I'd never been put in that situation before."  He pushed her onto the couch, put his hand under her shirt and bra, unfastened his pants, removed her pants, and then had sexual intercourse with her.  AJ testified that she was in pain during this incident but did not say anything.  When he was finished, her told her to hurry up and leave before others got suspicious.  Then, she returned to her room feeling "scared and miserable and hurt."  For this incident, the appellant was convicted of causing AJ to engage in sexual intercourse by placing her in fear of bodily harm *and* in fear of an impact on her military career.

AJ testified that she did not say or do anything while this incident was happening because "I've seen what he has done and what he's told us before and . . . I've seen him take down a whole dorm.  I've seen, or he's told us that we would be recycled and that there was nothing we could do if he ever did do anything or if he did get in trouble."  Even though basic training had just ended for her, AJ testified she could still be recycled and the appellant could still impact her career.  She was worried no one would believe her over him.  She also explained that she found the appellant "intimidating," and he had previously required her to engage in physical punishment beyond the point where she felt she would suffer physical harm.

In addition to being convicted of aggravated sexual assault for sexual intercourse with AJ, the appellant was convicted of violating a lawful general regulation by wrongfully seeking to develop a personal, intimate, or sexual relationship with AJ by making sexually suggestive comments about her, sending her unprofessional text messages, and engaging in sexual intercourse.

---

[10]  For this and the prior conduct, the appellant was convicted of violating a lawful general regulation by wrongfully seeking to develop a personal, intimate, or sexual relationship with AJ by making sexually suggestive comments about her and sending her unprofessional text messages.

*Trainee CW*

Another group of individuals went through basic training from May through July 2011. One of them was CW, a 20-year-old trainee in the appellant's flight.[11]

Several weeks into her training, the appellant called CW into his office. After she reported in, he asked about her boyfriend, who was Hispanic, and commented, "you like Hispanics because they can roll their Rs" and glanced down her body, which caused her to blush as she believed he meant it sexually. He also told her he hoped he would be sexually active when he was her father's age. On another occasion, he asked her "do you spit or swallow," asked her to show him on a ruler what penis size she liked and how many men she had "been with." She testified, "I was very uncomfortable, but when it's an MTI[,] you're not going to sit there and say that I'm not going to answer you" as the trainees do not know what the MTI will do in response as far as punishment.

At one point, the appellant had her in his office and repeatedly asked to see her birthmarks that were below her pants line, asking for a "peek." He approached where she was standing at parade rest and started biting and kissing her neck. When she jumped, her elbow hit the door, and he put his hand up to her mouth and told her to be quiet because other trainees were outside the office. He returned to his desk and asked if he could see her breasts. She said "no," and the encounter ended. She did not tell anyone because she was scared of what he would do if he found out she had.

The next day, the appellant called her back into his office and again asked her to show him the birthmarks. When she rolled down her pants, he bit and kissed her neck, put his hands down her pants and his fingers into her vagina. She stood "frozen" and "went numb." She testified that she was afraid he would punish her, punish the whole flight or jeopardize her career. She stated, "I did not know what to think. I did not know what to do." CW described herself as "more scared for myself than what my career was going to hold." He returned to the desk, wiped his hands on it, and told her to show him her breasts, which she did. She did not say "no" this time because "he was just going to keep at it . . . and I wanted to be out of there."

When the appellant heard rumors were going around about him, he called CW into his office with a dormitory chief and asked her if anything had happened. She lied and said "no." Calling the flight into the dayroom, he indicated he was very angry that

---

[11] The appellant was also convicted of misconduct with another female trainee who was in basic training during this same time frame as a member of his flight. Specifically, the appellant was convicted of violating a lawful general regulation on divers occasions by wrongfully seeking to develop a personal, intimate, or sexual relationship with a trainee named KS by making sexually suggestive comments about her tattoos and piercings, by viewing sexually explicit photographs and videos of her on her cell phone, and by telling her to "get naked," that she "turned him on" and "must be good at oral sex." He was convicted obstructing justice by "intimidating [KS] by implicitly asking [her] to lie about his misconduct."

rumors were jeopardizing his rank and MTI position. He then brought CW back into his office alone and said "remember, I'm a staff sergeant and you're a trainee and no one's going to believe you anyway."

For digitally penetrating CW, the appellant was convicted of aggravated sexual assault (by placing her in fear of an impact on her military career). He was also convicted of violating a lawful general regulation by wrongfully seeking to develop a personal, intimate, or sexual relationship with CW by making sexually suggestive comments about her, kissing her neck, digitally penetrating her, telling her to expose her breasts to him, and by viewing her exposed breasts. The appellant was also convicted of obstructing justice "by implicitly asking [CW] to lie about his misconduct, and intimidating trainees [in the flight] by telling them any allegations would not be believed."

*Analysis*

The appellant contends the evidence is factually and legally insufficient to sustain his convictions for committing aggravated assault against Trainees CM, LV, SR, AJ, and CW. The gravamen of his claim is that it is impossible to conclude beyond a reasonable doubt that the appellant did these sexual acts by placing the five women in fear of an impact on their military careers. We disagree.

"The test for factual sufficiency 'is whether, after weighing the evidence in the record of trial and making allowances for not having observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

"The test for legal sufficiency is 'whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt.'" *United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F 2002) (quoting *Turner*, 25 M.J. at 324). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). Our assessment of legal sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

As charged here, the Government's burden of proof was to prove by legal and competent evidence, beyond a reasonable doubt, (1) The accused caused the female trainees to engage in certain sexual acts (vaginal intercourse and/or digital penetration); and (2) He did so by placing the trainees "in fear of an impact on [their] military careers through the use and abuse of [his] military rank, position, and authority." *MCM*, Part IV, ¶¶ 45.a.(t)(7)(B)(ii)(III) and 45.b.(3)(a). For AJ, the Government also alleged (and thus had to prove) that she engaged in the sexual conduct due to fear of "bodily harm."

Having considered the entirety of the evidence presented at trial, we find the evidence factually and legally sufficient to sustain the appellant's convictions for committing aggravated assaults against the five women. The testimony of the women demonstrate they were placed in fear of suffering an adverse career impact by the appellant's conduct and, because of that fear, they engaged in sexual contact with the appellant.

The women were participating in a stressful and demanding training program where, by design, MTIs have a great deal of control and authority over the daily lives of the trainees and where trainees are expected to follow the orders and direction of the MTIs. The appellant used his position to require the women to report alone to locations under his control (including his office and other dormitories) and, contrary to regulations, went behind closed doors with them. He made inappropriate sexually-oriented comments to them and then moved on to hugging, kissing and/or groping them, also contrary to regulation. He next escalated to digital penetration and/or sexual intercourse, after again directing them to report to an isolated location. Throughout this, he ignored verbal and physical indications from the women that they were not willing to participate in this conduct. The appellant clearly used and misused his rank, MTI position, and authority to arrange for the young women to be alone in this vulnerable position with him. Each of the women testified about their thoughts and feelings as the MTI engaged in this course of misconduct with them, the actions they took or did not take as the appellant engaged in this conduct, and why they did not take different actions. This included testimony on their fears about the negative impact their careers could experience if they did not comply with the appellant's sexual advances, fears we find to be reasonable.

Considering the totality of the circumstances, we find the appellant, through the use and misuse of his military authority, acted in a manner of sufficient consequence to cause the five women to reasonably fear their military careers would be negatively impacted if they did not comply with his sexual advances, and that this fear caused them to engage in the sexual acts. We also find that AJ was placed in fear that she would be subjected to bodily harm if she failed to comply with the appellant. We are convinced of the appellant's guilt beyond a reasonable doubt and that a reasonable factfinder could have found all the essential elements beyond a reasonable doubt. We therefore find the evidence both factually and legally sufficient to sustain the six aggravated assault convictions involving the five women.

*Defense-Requested Instruction*

During a Rule for Courts-Martial (R.C.M) 802 session, trial defense counsel proposed an instruction concerning the "placed in fear" element of the aggravated assault specifications. Although trial defense counsel did not provide specific language for that instruction, the stated purpose was to "clarify[] that this offense is not a strict liability offense; specifically that the MTI/trainee relationship is not alone sufficient to establish a violation." The military judge denied trial defense counsel's request, finding the Benchbook instructions did not create the potential that members would improperly view the specifications as "strict liability" offenses.

Although counsel may request specific instructions, the military judge has substantial discretion in deciding on which instructions to give and whether the requested instruction is appropriate. *United States v. Miller*, 58 M.J. 266, 270 (C.A.A.F. 2003) (citation omitted). "This discretion must be exercised in light of correct principles of law as applied to the facts and circumstances of the case." *Id.* (citation omitted). A military judge's denial of a requested instruction is error if the requested instruction is: (1) correct; (2) not substantially covered in the main body of instructions; and (3) on such a vital point in the case that the failure to give the instruction deprived the appellant of a defense or seriously impaired its effective presentation. *Id.* (citations omitted).

The gist of the requested instruction is correct—the mere existence of an MTI/trainee relationship is not sufficient to establish that sexual contact between the two constituted an aggravated sexual assault. However, this point is substantially covered by the other instruction given to the panel, which informed the panel that the appellant had to place the trainees in fear that their military careers would be negatively affected (which then caused the women to engage in the sexual activity), and that this fear needed to be reasonable under the circumstances. That instruction makes clear that an MTI is not guilty of an aggravated sexual assault simply by engaging in a sexual act with a trainee and would not lead the panel to find that such an act is inherently nonconsensual.[12]

As such, the failure to give the defense-requested instruction did not deprive the appellant of a defense or seriously impair the effective presentation of a defense. In fact, in his findings argument, trial defense counsel argued that sexual contact between trainees and MTIs is not automatically criminal and reminded the panel of the military judge's instruction that the trainees' fear had to be reasonable. We therefore find the military judge did not abuse his discretion by refusing to give the requested instruction.

*Defense Presence at Article 32 Investigation*

---

[12] In fact, the appellant was not charged with aggravated sexual assault for engaging in sexual intercourse, oral sodomy, and anal sodomy with Trainee VS.

The Article 32, UCMJ, investigation into the charges was held on 19 December 2011. The appellant and his trial defense counsel (both military and civilian) waived their right to be present. In a pretrial session, the military judge ruled that references to that absence was inadmissible at trial as it "run[s] the danger of unfair prejudice in that the members might hold it against the [appellant] that he waived his right to be present . . . ." However, the military judge also ruled that if witnesses were questioned about the completeness of the account they gave during that hearing, trial counsel could ask the witnesses if trial defense counsel asked them any questions at the Article 32, UCMJ, hearing.

During trial, the deposition of former-Trainee LM[13] was played for the members after the military judge ruled her unavailable to appear at trial due to illness. When the videotape of that deposition was played for the panel, it included this exchange between trial counsel and the witness regarding trial defense counsel's presence at the Article 32, UCMJ hearing:

TC: What did you testify to at the Article 32 hearing?

LM: That I was under the overhang and he had told me that I sucked at life.

TC: So you, in fact, have testified to that before?

LM: Yes.

TC: *Now the defense counsel, did they ask you any questions at the Article 32 hearing?* (emphasis added)

LM: *I don't think they were there.* (emphasis added)

TC: So did they ask you any questions at that hearing?

LM: No.

TC: So if they were interested in asking questions at the Article 32 hearing, you could have answered them, correct?

LM: Correct.

DC: Same objection.

---

[13] The appellant was convicted of raping LM (by forcible digital penetration), attempted aggravated sexual contact by forcibly trying to place her hand on his exposed penis, and violating a lawful general regulation by wrongfully seeking to develop a personal, intimate, or sexual relationship with LM by hugging her, kissing her cheek and mouth, digitally penetrating her, and attempting to place her hand on his penis.

DO:    Noted.

The military judge had specifically informed trial counsel that the italicized portion of the deposition was to be redacted prior to being played for the panel.  None of the parties made any reference to this error as or after it occurred at trial.  The appellant now argues it was error for the prosecution to present this information to the members in contravention of the military judge's prior ruling, and that the findings and sentence should be set aside.

A military judge's decision to admit evidence over trial defense counsel's objection is evaluated for an abuse of discretion.  *United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008).  If an appellant did not preserve an objection to evidence by making a timely objection, that error will be forfeited in the absence of plain error.  *United States v. Brooks*, 64 M.J. 325, 326 (C.A.A.F. 2007); Mil. R. Evid. 103(d).  "A timely and specific objection is required so that the Court is notified of a possible error, and so has an opportunity to correct the error and obviate the need for appeal." 1 Stephen A. Saltzburg et al., *Federal Rules of Evidence Manual* § 103.02[1] (10th ed. 2011).  A mistrial is appropriate "when such action is manifestly necessary in the interest of justice because of circumstances arising during the proceedings which cast substantial doubt upon the fairness of the proceedings."  R.C.M. 915(a).

Although the appellant did initially (and successfully) object to this information being presented to the panel, he did not notify the military judge that the evidence had been admitted in contravention of the military judge's order.  Trial counsel and the military judge also failed to react when this occurred.  Whether we evaluate this issue under the plain error standard, under the abuse of discretion standard (as the appellant argues) or under the standard for declaring a mistrial (as the Government argues), we do not find merit in the appellant's argument.  This reference to the Article 32, UCMJ, investigation was brief and did not definitively state the appellant and his trial defense counsel had not been present at the hearing.  The Government did not make any argument or comment related to this point, and the military judge had already ruled that the Government could question the witnesses about whether trial defense counsel asked them any questions at that hearing.  Within this context, we do not find that the military judge abused his discretion by allowing this evidence to be admitted at trial, that it was not plain error for it to be admitted and that a mistrial was not necessary following its admission.

*Admission of Testimony about AFOSI's Investigation*

Also within LM's deposition was the following exchange:

TC:    Airman [LM], did you tell OSI . . . how long that assault occurred for?

LM:    I don't remember if I had told OSI or who I told but --- I don't know.

TC:    When OSI did the statement with you, first they did an interview, and then after that, they had you write your statement, is that correct?

LM:    Yes

TC:    Once you wrote this statement, did OSI go over it with you? . . .

LM:    Yes, they had gone over it with me.

TC:    *And they had verified that everything seemed to be accurate with what you had told them?*

LM:    *Yes.*

Prior to trial, the military judge overruled trial defense counsel's objection to the final question and answer. The appellant now contends this was an abuse of discretion as it constituted LM "self-bolstering" the veracity of the allegations she was making about the appellant. Without this question and answer, the appellant contends the panel may have had a reasonable doubt about whether the appellant sexually assaulted LM. We disagree. When considered in context, it is clear that trial counsel was asking LM whether her written statement was accurate relative to the oral statements she had just made to the agents and was not improper. As such, the military judge did not abuse his discretion in admitting it into evidence.

*Witness Non-availability*

Because LM was due to deliver a baby shortly before the projected trial date in July 2012, the military judge, in late April 2012, granted the Government's unopposed request that she be deposed. However, the military judge reserved ruling on whether that deposition would be admissible at the upcoming trial. The deposition occurred on 1 May 2012 and LM was questioned by both Government trial counsel and trial defense counsel.[14]

When the trial convened on 16 July 2012, trial counsel informed the military judge that LM had recently given birth to a baby in Idaho and therefore was unable to appear at the trial in Texas. LM's civilian doctor testified via speakerphone, explaining that LM was suffering from severe postpartum depression and had recently begun having suicidal

---

[14] The military judge ordered the unedited version of this videotaped deposition be attached to the record of trial as Appellate Exhibit LVI. However, the record of trial erroneously has the transcript of LM's Article 32, UCMJ, testimony as that exhibit. The Government is hereby directed to correct this error.

thoughts due to being pushed "over the edge" by her emotional reaction to the pending court-martial and the potential separation from her baby if she attended the trial. This caused the civilian doctor to send her to a local emergency room. LM was cleared that same day to go home and was placed on anti-depressants and advised to seek mental health counseling. In the doctor's view, LM's severe depression could be made worse if she also had to deal with the court-martial.

The defense continued to assert that LM should be brought to Texas for the trial and her deposition should not be admitted, though it did not ask for the trial to be continued to a later date. The military judge found LM suffered from an illness which constituted "reasonable cause" for her to be unable to appear in person at the court-martial. Because the trial defense counsel had been able to cross-examine LM at the deposition, the military judge found no Sixth Amendment[15] concerns with the admission of the videotaped deposition as an alternative to testimony under Article 49, UCMJ, 10 U.S.C. §849 given her unavailability.[16] The videotaped deposition was then played for the panel. The appellant was ultimately convicted of all the offenses involving LM.

Pursuant to *Grostefon*, the appellant contends the military judge abused his discretion when he found LM unavailable to testify at trial and that his ruling violated the appellant's Sixth Amendment right to confront his accuser. However, Article 49, UCMJ, permits the use of depositions at courts-martial so long as they are otherwise admissible under the rules of evidence. Article 49(d), UCMJ, provides for such use if a witness, "by reason of . . . sickness, bodily infirmity, . . . or other reasonable cause, is unable or refuses to appear and testify in person at the place of trial or hearing." *See also* R.C.M. 702.

A military judge's determination of a witness' unavailability is reviewed for abuse of discretion. *United States v. Cabrera-Frattini*, 65 M.J. 241, 245 (C.A.A.F. 2007). "Findings of fact are affirmed unless they are clearly erroneous; conclusions of law are reviewed de novo." *United States v. Rader*, 65 M.J. 30, 32 (C.A.A.F. 2007). If the military judge applied the correct law and the factual findings are not clearly erroneous, neither the military judge's decision to admit evidence, nor his unavailability ruling, should be overturned. *Id.* at 33; *United States v. McDonald*, 59 M.J. 426, 430 (C.A.A.F. 2004) (citations omitted).

The Confrontation Clause of the Sixth Amendment to the Constitution requires that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." *Crawford v. Washington*, 541 U.S. 36, 42 (2004) (alteration in original) (citation omitted). "[P]rior trial or preliminary hearing testimony

---

[15] U.S. CONST. amend. VI.
[16] Prior to being played for the members, the videotape was edited to remove defense objections and other inadmissible material.

is admissible only if the defendant had an adequate opportunity to cross-examine . . . . Even where the defendant had such an opportunity, [the Supreme Court has] excluded the testimony where the [G]overnment had not established unavailability of the witness." *Id.* at 57 (citations omitted). The Supreme Court emphasized, "[w]here testimonial evidence is at issue," the Constitutional necessity of "unavailability and a prior opportunity for cross-examination" remains. *Id.* at 68. "When a deposition is offered against an accused, the Government must establish that the witness is unavailable, both in terms of the hearsay prohibition of Mil. R. Evid. 804(b)(1) and in terms of the Confrontation Clause of the Sixth Amendment." *United States v. Vanderwier*, 25 M.J. 263, 265 (C.M.A. 1987).

In assessing unavailability of a witness, several factors should be considered, including "the importance of the testimony, the amount of delay necessary to obtain the in-court testimony, the trustworthiness of the alternative to live testimony, the nature and extent of earlier cross-examination, the prompt administration of justice, and any special circumstances militating for or against delay." *United States v. Cokeley*, 22 M.J. 225, 229 (C.M.A. 1986). Where a witness's absence is due to illness, a court should also consider the nature of the illness and its probable duration. *Cabrera-Frattini*, 65 M.J. at 245-46 (citations omitted). "[T]here is ample precedent for finding a witness, even a critical one, unavailable where the act of testifying in court is determined to be detrimental to the witness's physical or mental well-being." *Id.* at 246 (citations omitted).

The military judge applied the correct law and we do not find the military judge's findings of fact on this issue to be clearly erroneous, given the testimony of LM's treating physician. Under the particular facts of this case, we hold that the military judge did not abuse his discretion by concluding LM was unavailable and in admitting her videotaped deposition testimony.

*Discovery Violation*

Prior to trial, the military judge granted a defense motion requesting an in camera review of any mental health records regarding the female trainees. The prosecution later stated "if records exist for the victims, they are being provided to the military judge . . . ." The military judge issued an order directing the custodians of records for the witnesses, including VS and KS, to conduct a review for such records and provide them for the in camera review. No records for those two women were provided to the military judge.

During the sentencing phase of the court-martial, VS testified that she has anger issues at work as a result of the appellant's conduct with her and "I've seeked [sic] out medical help for it." KS testified, "They have me on medication because I'm having anxiety attacks." During an Article 39(a), UCMJ, 10 U.S.C. § 839(a) session, trial defense counsel complained about the apparent discovery violation, as no mental health

records from these two women had been provided. Trial counsel initially stated that neither woman had seen any mental health providers and the medication they referenced was either over-the-counter or something that their medical doctor gave them for anxiety. Trial counsel then stated he believed the records of VS had been provided to trial defense counsel. The military judge later concluded the testimony of the witnesses did not raise a question about compliance with his order or the Government's discovery obligations.

The appellant contends the military judge abused his discretion by failing to find a violation of his discovery order. Pursuant to *Grostefon*, the appellant cites to similar statements about the women's mental health in certain news articles and alleges that this situation constituted a violation of the Government's obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). He also alleges that the Government also improperly failed to turn over a witness statement made by a fact witness in the case.

A military judge's decision on a discovery request is reviewed for an abuse of discretion. *United States v. Morris*, 52 M.J. 193, 198 (C.A.A.F. 1999). The burden is on the appellant to prove that the Government withheld discoverable evidence. *United States v. Guthrie*, 53 M.J. 103, 105 (C.A.A.F. 2000). If an appellant fails to make a colorable showing that the alleged derogatory information exists, no further inquiry is warranted. *See United States v. Campbell*, 57 M.J. 134, 138 (C.A.A.F. 2002). Here, we do not find an abuse of discretion in the military judge's decision that his order had not been violated.

*Prosecutorial Misconduct*

Pursuant to *Grostefon*, the appellant alleges the prosecutors in his case committed misconduct by (1) Making an inflammatory closing argument; (2) Enlisting the help of members of Congress to support the prosecution's case; and (3) Fabricating stories about the availability of LM. Specifically, the appellant contends that the trial counsel's findings argument improperly misconstrued the trial evidence by citing to evidence and scenarios that were not admitted into evidence and referring to the appellant's prior loss of his MTI hat and that the prosecution provided the military judge false information about LM's medical situation. He also alleges that media articles indicate the prosecutors took one of the female trainees in his case to "talk to Senators."

Prosecutorial misconduct is generally defined as "action or inaction by a prosecutor in violation of some legal norm or standard, e.g., a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996). In *Smith v. Phillips*, 455 U.S. 209, 219 (1982), the Supreme Court opined that "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." Accordingly, courts should gauge the overall effect of trial counsel's conduct on the trial. *See id*. at 219-20.

We do not find merit in the appellant's arguments. Trial counsel's arguments were fairly based on the evidence as well as reasonable inferences drawn therefrom, and the military judge instructed the panel to disregard trial counsel's reference to the appellant's MTI hat. *See United States v. Nelson*, 1 M.J. 235, 239 (C.M.A. 1979). The media articles cited by the appellant do not demonstrate that the prosecutors were involved in any interaction the victim had with members of Congress. Regarding LM's unavailability, although trial counsel did initially and incorrectly proffer to the military judge that LM's baby had been born prematurely, that issue was clarified before the military judge issued his ruling regarding whether LM was available to testify at the appellant's court-martial. None of these allegations demonstrate a violation of any legal norm or standard nor that the appellant's trial was unfair.

*Cumulative Error*

"The cumulative effect of all plain errors and preserved errors is reviewed de novo." *United States v. Pope*, 69 M.J. 328, 335 (C.A.A.F. 2011). Under the cumulative-error doctrine, "a number of errors, no one perhaps sufficient to merit reversal, in combination necessitate the disapproval of a finding." *United States v. Banks*, 36 M.J. 150, 170-71 (C.M.A. 1992) (internal quotation marks and citation omitted). An appellate court can order a rehearing based on the accumulation of errors not reversible individually if it finds the cumulative errors denied the appellant a fair trial. *United States v. Dollente*, 45 M.J. 234, 242 (C.A.A.F. 1996). Having found no error in this case, we also find no cumulative error.

*Conclusion*

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of the appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c).

Accordingly, the approved findings and sentence are

AFFIRMED.

FOR THE COURT

STEVEN LUCAS
Clerk of the Court